422 So.2d 402 (1982)
NEW ORLEANS FIREFIGHTERS ASSOCIATION, et al.
v.
CIVIL SERVICE COMMISSION OF the CITY OF NEW ORLEANS, et al.
No. 82-C-0025.
Supreme Court of Louisiana.
October 29, 1982.
Rehearings Denied December 17, 1982.
*404 Ralph D. Dwyer, Jr., New Orleans, for applicant.
Louis L. Robein, Jr., Barker, Boudreaux, Lamy, Gardner & Foley, New Orleans, Salvador Anzelmo, City Atty., Galen S. Brown, Deputy City Atty., for respondent.
DENNIS, Justice.
We are confronted here with the problem of determining the allocation of constitutional *405 power between the Legislature and the City Civil Service Commission to make rules of law establishing New Orleans firefighters' minimum and overtime wages. This question, which is one of first impression under the 1974 Louisiana Constitution, arises because of a conflict between state statutes requiring inclusion of firefighters' supplemental salaries in overtime wage computations and the New Orleans Civil Service Commission's uniform pay plan, which excludes such salaries from the calculations.
The New Orleans Firefighters Association Local 632 AFL-CIO and several of its members filed this class action suit against the City of New Orleans and the City Civil Service Commission requesting a judgment declaring their rights to have supplemental salaries included in overtime wage computations and a mandamus of the defendants to enforce these rights.[1] After a trial on the merits, the trial court found that the civil service rule for the calculation of overtime wages was ambiguous and not in conflict with an agreement entered into by the city with the firemen's union to pay overtime wages based on supplemental salaries, and held that the agreement was enforceable.[2] However, the instruments in question and the record indicate that the pay plan is unambiguous, that the agreement is in conflict with the pay plan, and that the agreement is therefore unenforceable unless it can be shown that the civil service commission rule is invalid.[3] The court of appeal affirmed the result reached by the trial court, but reasoned that because the supplemental salary statute regulates minimum wages, a subject upon which the constitution has reserved to the legislature its plenary power to legislate, the statute takes precedence over the civil service commission's pay plan. We granted certiorari to review the court of appeal's interpretation and application of legal and constitutional precepts.
Specifically, we are called upon to answer two questions: (1) Does the Legislature's plenary power to enact a law providing for *406 "minimum wages" or "working conditions" for firemen yield to the Civil Service Commission's power to adopt uniform pay scales? (2) Do the statutes setting a minimum wage schedule, overtime rules, and supplemental salaries constitute law providing for "minimum wages" or "working conditions" for firemen?

I

A
The 1974 Louisiana Constitution reserves to the Legislature its plenary power to enact law providing for the minimum wages and working conditions of firemen. This power is not diminished by, nor in conflict with, the power of the City Civil Service Commission to adopt a uniform pay plan affecting the salaries of New Orleans firefighters. Although the power of the City Civil Service Commission is exclusive within its sphere of authority, the setting of a statewide floor under wages and a standard for working conditions is solely within the prerogative of the legislature. Laws duly enacted by the legislature on these subjects must be accepted by the commission in formulating a uniform pay plan.
Article 6 § 14 of the 1974 Louisiana Constitution provides:
No law requiring increased expenditures for wages, hours, working conditions, pension and retirement benefits, vacation, or sick leave benefits of political subdivisions employees, except a law providing for civil service, minimum wages, working conditions, and retirement benefits for firemen and municipal policemen, shall become effective until approved by ordinance enacted by the governing authority of the affected political subdivision or until the legislature appropriates funds for the purpose to the affected political subdivision and only to the extent and amount that such funds are provided. This Section shall not apply to a school board.
This section acts as a limitation upon the otherwise plenary lawmaking power of the Legislature recognized by Art. 3 § 1 of the Constitution. It provides that legislation increasing a political subdivision's employee benefits shall not become effective until approved by its governing authority or until the legislature appropriates funds for the purpose.
The provision contains an exception, however, which reserves to the legislature its power to enact laws "providing for civil service, minimum wages, working conditions, and retirement benefits for firemen and municipal policemen...." Id. The language and logic of this provision, as well as the proceedings in the convention which drafted the constitution, indicate that the lawmaking power of the Legislature is not qualified, either conceptually or geographically, on these subjects.
The legislative power of the state is vested in the Legislature. La.Const. 1974, Art. 3 § 1. Except as expressly provided by the constitution, no other branch of government, nor any person holding office in one of them, may exercise the legislative power. Id. Art. II §§ 1 and 2. Furthermore, it is a general principle of judicial interpretation of a state constitution that, unlike the federal constitution, a state charter's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature. In its exercise of the entire legislative power of the state, the legislature may enact any legislation that the state constitution does not prohibit. Thus, to hold legislation invalid under the state constitution, it is necessary to rely upon some particular constitutional provision that limits the power of the legislature to enact the statute appealed. State ex rel Guste v. Legislative Budget Committee, 347 So.2d 160 (La.1977); Hainkel v. Henry, 313 So.2d 577 (La.1975); In re Gulf Oxygen Welder's Supply Profit Sharing Plan, 297 So.2d 663 (La.1974). See also, State v. Mallery, 364 So.2d 1283, 1284 (La.1978) ("Except as limited by the constitution its power is plenary"); Swift v. State, 342 So.2d 191, 194 (La.1977) ("Unlike Congress, our State Legislature has all powers of legislation not specifically denied it by the Louisiana constitution").
*407 There is nothing in the wording of Art. 6 § 14 that restricts the power of the legislature to enact minimum wage and working condition laws for firemen. On the contrary, this power is expressly reserved to the legislature as an exception to the provision's restraint upon laws increasing the financial burden of political subdivisions.
The subject matter left by Art. 6 § 14 to the legislature's prerogative, and the policy choices inherent in any action in that area, require that no limitations be placed upon the legislature's power regarding firemen's minimum wage and labor standards statutes. In order to set a floor under wages and eliminate substandard labor conditions in fire departments generally, it is necessary that the legislature be empowered to deal with such issues comprehensively. If the lawmaking branch were restricted either by geographical limitation or the policy of other agencies in considering socioeconomic data and formulating fair labor standards, it would be impossible for it to establish a minimum wage or a standard working condition pursuant to its own conception of state policy. Since the constitution plainly calls for the legislature to establish statewide rules for the measurement of firemen's wages and working conditions, we conclude that its power in this regard is exclusive.
The record of the debates at the constitutional convention confirms our interpretation as being consistent with the understanding of delegates both for and against the provision. Although we do not find any ambiguity in the constitution on the question, proceedings in the convention which drafted the instrument are valuable aids, and should be given some weight, in determining the purpose, intent, and consequent meaning of provisions for those who find them doubtful. See, State ex rel Brewster v. City of New Orleans, 35 La.Ann 532 (1883). See, e.g. Hainkel v. Henry, supra. See generally, 16 Am.Jur.2d Const.Law § 129 at n. 95.
Article 6 § 14 was proposed by the Committee on Local and Parochial government, adopted by the constitutional convention without substantial change, and approved by the electorate. Most of the convention debate on this section focused on whether to delete or modify the language reserving the Legislature's prerogative over minimum wages and labor standards for firemen and policemen. Opponents of the reservation of the legislative power introduced proposed amendments to either delete or defeat the provision. Delegate Lennox proposed an amendment to delete the legislative power clause which was defeated by a vote of 48 to 73. 7 Records of the Louisiana Constitutional Convention of 1973; Convention Transcripts 1480, 1492. The failure of the Lennox proposal inspired Delegate Lowe to offer an amendment deleting the entire section, but it also was defeated by a vote of 36 to 78. 7 Records of the Louisiana Constitutional Convention of 1973: Convention Transcript 1496. Finally, and most significantly, Delegate Rachal proposed an exemption for the City of New Orleans and its civil service commission from the effect of state minimum wage and working condition laws for firemen and policemen. 7 Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts 1497. This crucial amendment, which epitomizes the controversy now before the court, failed by a 43 to 71 vote. Id. at 1498. During the debate, spokesmen for both sides expressed the view that the outcome of these amendments would be constitutionally decisive of the issue.[4] Art. 6 § 14 was adopted by a *408 vote of 85 to 30 with the reservation of legislative power over minimum wages and labor standards for firemen and municipal policemen intact. 7 Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, 1500.
The record of the convention proceedings indicates that the legislature's power to set minimum wage and labor standards prevailed because of the obviously compelling state interest in providing citizens with more effective police and fire protection.[5] In expressing variants of this theme, several delegates deplored the failure of local governing authorities to give these needs a higher priority than other community programs[6], while others called attention to the risks of disparate levels of local fire and police protection resulting from lack of general legislative oversight of minimum standards.[7] However, the driving force in retaining the legislative prerogative was a widely perceived need for state government to address vigorously the problems of rising crime, riots and other public disorders *409 which had become prevalent in the 1960's and early 1970's.[8]
We conclude that the fire and police minimum wage provision of Art. 6 § 14 is not only an exception to the home-rule financial autonomy created by the remainder of the section, but also is a positive reaffirmance of the plenary power of the legislature to guarantee adequate fire and police protection for all citizens of Louisiana. We now turn to a consideration of appellant's contention that this power is constrained by another provision of the state constitution.

B
The Legislature's power to enact a minimum wage and working condition law for firemen is not limited by the New Orleans Civil Service Commission's constitutional power to adopt a uniform pay plan. There is nothing in the language of the constitution, the debates of the delegates, or the purposes of the Civil Service which manifests an aim to exempt City of New Orleans' firefighters from the plenary power of the legislature on this subject. The commission has the exclusive constitutional power to make rules for the administration and regulation of the merit system of classified civil service, including the power to adopt a uniform pay and classification plan. La.Const. art. 10 § 10(A)(1). Accordingly, the Legislature is not authorized to enact pay plans or amend the City Civil Service Commission's pay plan. However, the plenary power of the Legislature to enact minimum wage and labor standards laws for firemen is reserved by the constitution. The City Civil Service Commission, therefore, must take into consideration any valid, minimum wage law affecting city firefighters in adopting a uniform pay and classification plan.
For the purpose of the administration and regulation of the merit system of civil service and to accomplish its objectives and purposes, Article 10 § 10(A) of the 1974 Louisiana Constitution vests the City Civil Service Commission with broad and general rule making powers, including the power to make regulations within several specific areas of typical civil service concerns.[9] Consequently, the Commission is granted only that lawmaking power which is necessary to its effectuation of the objectives and purposes of the civil service. Although the language, history, and convention debates surrounding this provision suggest that it should be construed generously in favor of fulfilling the goals of civil service, there is no indication that it was the constitutional aim to vest any legislative powers in the commission except those required for this purpose. The debate accompanying the passage of the civil service provisions related mainly to whether to retain them in the constitution at all and to the reorganization of the commission. There was no attempt to reopen the dispute over the legislature's power to set minimum wages for firemen and municipal policemen which had been settled by the adoption of Article 6 § 14.[10] *410 Therefore, we must look to the objectives and purposes of the merit system of civil service and classified service to determine the ambit of the Commission's authority.
The fundamental purpose of civil service laws and rules is to establish a merit system for selecting non-policy forming public employees on the basis of merit and providing that they can be discharged only for insubordination, incompetency, or improper conduct, and not for religious or political reasons. 3 C.E. Dunbar, Jr., Projet of a Constitution for State of Louisiana 500 (1954). State ex rel Murtagh v. Dept. of City Civil Service, 215 La. 1007, 42 So.2d 65 (1949). Perkins v. Director of Personnel, 220 So.2d 253, 256 (La.App. 1st Cir.1969). Civil service is designed to abrogate the "spoils system" under which public employees are not selected for employment and promotion on the basis of merit or qualifications for the position but as rewards for faithful political activity and service, so that the job holders and their families become economic slaves of a particular political organization and have to vote and work for the candidates of their faction regardless of the character or qualifications of the candidates. Dunbar supra at 500. State ex rel. Boucher v. Heard, 228 La. 1978, 84 So.2d 827, 830 (1955). The routine operation of a civil service system by merit selection, compensation regulation, and tenure protection serves to promote efficiency by abolishing useless and unnecessary jobs, maximizing the resources invested in employees by long service, and determining salary and length of service on the basis of benefits rendered to the people rather than to the victorious party. Dunbar, supra, at 502. Vidrine v. State Parks and Recreation Commission, 169 So.2d 641, 645 (La.App. 1st Cir.1964).
Because of the peculiar history of civil service in Louisiana, the inclusion of detailed provisions on civil service in the constitution contrary to the principles of a brief charter has been deemed necessary by legal scholars. Dunbar, supra p. 499. A self-operative merit system established in the constitution so that it can be repealed or amended only by a vote of the people has been deemed essential to the protection of civil service against repeal or weakening amendments and sabotage by a temporary majority vote of a spoils-minded and partisan legislative faction. Dunbar, supra, at 501.
Historically, the state and city civil service commissions have no political policyforming functions or powers. On the contrary, their primary function is quasi-judicial, and they must see to it that the rank and file of state and city employees are selected competitively on the basis of merit, free from political influence. They must also see that these employees are protected from dismissal or discriminatory treatment because of religious or political reasons. The state and city commissions are in substance courts of appeal, and their functions are to be impartially administered by commissioners who are absolutely free from any sort of political control or influence. Dunbar, supra, p. 504. Thus, the civil service commission is authorized to establish rules governing the administration of the system, is empowered in general to supervise the conduct and administration of the system, and is a quasi-judicial body for purposes of appeal. Dunbar, supra, p. 506.
In order to accomplish these purposes and objectives it is not necessary that the Civil Service Commission's quasi-judicial function include the power to override state minimum wage and working condition laws for firemen and municipal policemen enacted by the legislature pursuant to its conception *411 of a compelling state interest. To safeguard merit selection and promotion, protect against discriminatory dismissal or treatment and free public employees from political influence or reprisal does not require that the City Civil Service Commission have the faculty to modify statewide minimum wage levels or labor standards. Nor does the Legislature's setting of a statewide floor under wages and a ceiling over hours as a matter of state policy to promote efficient law enforcement and fire protection frustrate the function of the civil service. There is no inherent conflict between the power to establish a minimum wage level and the power to fix salaries above this floor because these powers operate on different planes to accomplish different purposes. Minimum wage laws guarantee workers at least a living wage. Uniform pay plans protect them from unfair wage discrimination. The setting of a basic floor under wages calls for a lawmaking body of statewide authority representing the broadest diversity of interests and viewpoints. Devising a pay plan is a task more appropriate for a quasi-judicial body such as the civil service commission which is capable of weighing the equities and considerations of fairness among different classifications of employees with respect to compensation and promotion. In the event of a disagreement between the civil service commission and the legislature as to what ought to be the minimum wage level of a fireman or municipal policeman, of course, the commission must yield because this policy question is outside the ambit of its quasijudicial function. As a practical matter, however, the risk of such a dispute ever arising is very remote, as attested to by the low state minimum wage for firemen and the much higher salaries for New Orleans firefighters fixed by the City Civil Service Commission's pay plan. Ultimately, the question of the least amount a fireman should be paid in the State of Louisiana to assure adequate protection in all communities is a matter of public policy within the legislative prerogative of the Legislature; and the question of what plan should be adopted setting actual salaries of public employees to insure selection, promotion, and treatment of employees on the basis of merit, free from political influence, is a quasijudicial function within the prerogative of the City Civil Service Commission.
We conclude that the plenary legislative power to adopt laws providing for minimum wages and working conditions of municipal policemen and firemen does not yield to the Civil Service Commission's power to adopt uniform pay plans. Having made this determination, it only remains for us to decide whether the legislature has exercised its power in this regard, and enacted legislation which provides for minimum wages or working conditions of New Orleans firemen by requiring that state supplemental salary payments be included in their base pay for the calculation of overtime wages.

II
The supplemental salary law in combination with the firemen's minimum wage law provides a minimum standard of income and working conditions for firemen. These laws together establish the least amount which employees of local fire departments must be paid for regular work hours and overtime. This statutory scheme enacted by the Legislature is by all intents and purposes a law providing minimum wages and working conditions for firemen.
La.R.S. 33:1992 provides that each fireman in municipalities of 12,000 or more and paid firemen in parish and fire protection departments shall receive at least a salary of four hundred dollars per month. La.R.S. 33:2002 provides that, in addition to other compensation, a fireman regularly employed and paid by any municipality, parish or fire protection district, shall be paid extra compensation by the state at least in the amount of one hundred forty dollars per month at the completion of three months of service. Except in emergencies, a fireman may not be required to work more than sixty hours in any calendar week, and shall receive overtime wages at the rate of one and one-half times his usual salary. R.S. 33:1994.
*412 To determine whether these statutes constitute minimum wage legislation we will compare them with the outstanding example of a minimum wage and working condition law, the Fair Labor Standards Act of 1938, 29 U.S.C. 201 et seq. In essence, it provides that employees covered by the Act are guaranteed various minimum hourly rates of pay, 29 U.S.C. 206, and time and one half for any work in excess of forty hours per week. 29 U.S.C. 207. The congressional aim of the statute is to place a floor under wages and a ceiling over hours that can be worked at straight time pay to eliminate labor conditions detrimental to the health, efficiency, morale and well being of workers and to eliminate unfair competition based on these conditions. Id. § 202(a). Bay Ridge v. Aaron, 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502 (1948), Overnight Transport Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942), U.S. v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); Marshall v. Western Union, 621 F.2d 1246 (3rd Cir.1980); Marshall v. Hamburg, 577 F.2d 444 (8th Cir.1978) Brennan v. Wilson Bldg, Inc., 478 F.2d 1090 (5th Cir.1973); BNA, The New Wage and Hour Law, Operations Manual (1967); Wests' Federal Practice Manual § 1132. Both the minimum wage and maximum hours or overtime provisions are minimum wage requirements compelling the payment of a minimum standard wage with a prescribed increased wage for overtime. U.S. v. Darby, 312 U.S. at 125, 61 S.Ct. at 462, 85 L.Ed. at 623. In other words, it is a statutory "scheme to raise substandard wages first by a minimum wage and then by increased pay for overtime work." Overnight Transport Co. v. Missel, 316 U.S. at 577, 62 S.Ct. at 1219, 86 L.Ed. at 1687. The overtime or maximum hours requirement, however, also operates as a working condition regulation because it serves the purpose of encouraging employers to distribute work among a larger number of employees rather than imposing lengthy hours of labor at low wages. Bay Ridge v. Aaron, supra; Marshall v. Western U, supra; Marshall v. Homberg, supra. The provisions are remedial and humanitarian in purpose and must not be interpreted or applied in a narrow, grudging manner. Tenn. Coal, Iron, and RR Co. v. Muscoda Local No. 123, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949, (1944); Brennan v. Wilson Bldg. Inc., supra. The motive and purpose of the legislation are plainly to make effective the congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce and to the states from and to which the commerce flows. U.S. v. Darby, supra, 312 U.S. at 115, 61 S.Ct. at 457, 85 L.Ed. at 617.
The principal elements of the Louisiana firemen's minimum and supplemental wage laws, La.R.S. 33:1991 et seq. and La.R.S. 33:2001 et seq., closely resemble the provisions of the Fair Labor Standards Act of 1938. Together our statutes require that a fireman must be paid at least $540 per month and receive one and one-half times his usual pay for any time worked over sixty hours in a calendar week. Thus, they establish a floor under firemen's wages and a ceiling over hours that can be worked without receiving premium pay, resulting in a single scheme to raise substandard wages first by a minimum wage, and then by increased pay for overtime. The Louisiana statutes affect a narrower class of employees, but there is no difference in principle between our statutes and the federal minimum wage and working condition laws. The motive and purpose of the legislature were plainly to make effective its conception of public policy that substandard labor conditions in city, parish and other local fire departments should be eliminated as being injurious to the safety and welfare of the public as well as detrimental to the health, efficiency and morale of firefighters. Accordingly, we conclude that these provisions constitute an exercise of the legislature's plenary power to enact minimum wage and working condition laws for municipal firemen and policemen. They are remedial and humanitarian in purpose and must not be interpreted narrowly.
*413 Consequently, a fair and ungrudging construction of the Louisiana firemen's supplemental salary law demands that it be read in pari materia with the firemen's minimum wage law. Supplemental pay must be considered as part of the floor under wages for purposes of determining overtime wages in order to avoid a strained interpretation and give full effect to the remedial and humanitarian purpose of the statutes. R.S. 33:1994 provides that overtime wages shall amount to one and onehalf times a fireman's usual salary. A fireman's usual salary includes at least the total amount of compensation guaranteed to him by law under both minimum wage and supplemental salary statutes. This is confirmed by R.S. 33:2004(D) which provides that a fireman's supplemental salary shall be included in the calculations and computation of total wages paid to the fireman in the determination of all employee benefits. The right to receive premium pay for overtime work is certainly a benefit to an employee. It is something which, if not required by law, would be subject to bargaining between him and his employer. We are unconvinced by appellant's argument that premium overtime wages are not an "employee benefit" as contemplated by R.S. 33:2004(D). See Williams v. City of West Monroe, 403 So.2d 842 (La.App. 2d Cir. 1981). Furthermore, if an employer could circumvent the overtime requirement simply by labelling compensation as extra or supplemental pay, the public policy underlying the legislation would be defeated. Our courts have consistently held in a variety of contexts that state supplements are to be considered as part of the overall level of compensation due to employees. See e.g., Hebbler v. New Orleans Fire Department, 310 So.2d 113 (La.1975) (State supplements are part of "salaries and wages" in R.S. 49:113 requiring that salary must be restored by city for period of illegal separation from service); Latino v. City of Bogalusa, 295 So.2d 560 (La.App. 1st Cir.1974) (state supplement must be included in calculation of overtime wages under R.S. 33:2213); Maes v. City of New Orleans, 97 So.2d 856 (La.App.Orl.1957) (state supplement is part of "salary" subject to pension deduction under R.S. 33:2218.1 et seq.).
For these reasons, we conclude that the City Civil Service Commission is not free to ignore the legislative commandment to include state supplements in calculating overtime pay. This commandment is embodied in the scheme of minimum wages for firefighters and is a valid use of legislative power pursuant to Article 6 § 14 of our constitution.

III
The previous opinions of this court in Louisiana Civil Service League v. Forbes, 258 La. 390, 246 So.2d 800 (1971) and Barnette v. Develle, 289 So.2d 129 (La.1974) do not govern this case. The obstacles to the legislation found in those decisions under the 1921 Louisiana Constitution, as amended, have been removed by the adoption of the 1974 Constitution.
In Forbes, this court adopted in substantial part the written opinion of a trial court judge declaring unconstitutional an act of the legislature. According to the opinion, as approved by this court, the essential purpose of the statute was "to give the Louisiana State Troopers a well-deserved pay raise...." 258 La. at 401, 246 So.2d 800. The statute was struck down "[b]ecause the Constitution renders the Legislature powerless to effect a change in the compensation of classified employees, the constitution concludes that [the statute] which makes such an attempt, is null and void, being in contravention of the Civil Service Amendment to the Louisiana State Constitution." 258 La. At 412, 246 So.2d 800. The principles governing Forbes are inapplicable in the present case. First, although the statute at issue appears to have been intended by the legislature as a minimum wage law, the court carefully characterized the act as a "pay-raise" or "change of salary" law. Thus, the court's holding really does not resolve the question of whether the Legislature's plenary power to establish minimum wage laws setting a floor under wages, as opposed to the power to actually set each *414 employee's salary, had been ceded to the Civil Service Commission. Forbes holds merely that because the State Civil Service Commission had the power to adopt a uniform pay plan for the state police, the legislature could not amend the pay plan or grant pay raises to the troopers. Secondly, the 1921 Constitution's Civil Service Provisions forming the basis for Forbes have been replaced by the 1974 Louisiana Constitution, and article 6 § 14 of the new constitution expressly reserves to the Legislature the plenary power to enact minimum wage and working condition standards for firemen and municipal policemen.
In Barnette this court declared unconstitutional "as applied to the City of New Orleans," 289 So.2d at 133, the firemen's minimum wage law, the effect of which it viewed as "fix[ing] the salaries and annual vacation time of firemen in cities of 12,000 or more population." Id. As in Forbes, this court's opinion dealt with the 1921 constitution which did not contain the express reservation of the legislature's power to enact minimum wage laws provided by article 6 § 14 of the 1974 Louisiana Constitution. Also, as in Forbes, this court failed to recognize the difference between the power to establish minimum wage standards and the power to fix salaries and uniform pay plans. In essence, Barnette decided a different issue under a different constitution from those at issue in the present case. Since the issue in this case is res nova under the 1974 Louisiana Constitution, neither of our former decisions in Forbes or Barnette can serve as a precedent in this case.
This court's holding in Barnette that the firemen's minimum wage law is unconstitutional as applied to the City of New Orleans did not mean that the statute could not be applied elsewhere within the state. We have accepted the principle that language broad enough to be applied both validly and invalidly may be restricted to those applications within the legislative authority, when such a result conforms to what the legislature intended and does not destroy the fundamental purpose of the act. State v. Johnson, 343 So.2d 705 (La.1977); Roy v. Edwards, 294 So.2d 507 (La.1974); Mims v. West Baton Rouge Parish School Board, 315 So.2d 349 (La.App. 1st Cir.1975); 2 Sands, Sutherland Statutory Construction, § 44.17; (4th ed. 1973). The aim of the firemen's minimum wage law is to set a floor under wages and a ceiling over hours for all firemen in cities of 12,000 or more and all paid firemen in other departments. Therefore, the removal of the City of New Orleans from the ambit of the statute by judicial interpretation did not destroy the statute's fundamental purpose or utility.
Consequently, this is not a case of a law, or a distinct and separable part of a law, enacted in the unauthorized exercise of a power completely denied to the Legislature, Etchison Drilling Co. v. Flournoy, 131 La. 442, 59 So. 867 (1912), but of a law which it was competent for the lawmakers to pass, but which could not operate within the City of New Orleans during the existence of the 1921 Louisiana Constitution's civil service provisions. The 1974 Louisiana Constitution, which modified these provisions and expressly reserved the legislature's plenary power on the subject matter in question, removed the obstacle. Additionally, upon careful reflection, we do not view the firemen's minimum wage law as an attempt by the legislature to fix salaries or to amend a civil service pay plan but as a good faith effort to set a floor under wages and a ceiling over hours pursuant to a consistent statewide public policy. We perceive, therefore, no adequate grounds for adjudging that a reenactment of the statute was required before it could have the effect within the city which it had always had throughout the state. Cf., Wilkerson v. Rahrer, 140 U.S. 545, 11 S.Ct. 865, 35 L.Ed. 572 (1890).

Decree
In adopting a uniform pay plan, the City Civil Service Commission is obliged to comply with and take into consideration the firemen's minimum wage law, R.S. 33:1991, et seq., and the firemen's supplemental wage law, R.S. 33:2001, et seq. Accordingly, the commission is ordered to revise its *415 uniform pay plan in accordance with these laws. Since there appear to be various ways in which the commission could comply with this decree, we limit our mandamus to the foregoing out of respect for the discretion vested in the commission by the constitution. The declaration of law and facts in this opinion shall have the force and effect of a final declaratory judgment. The judgments of the trial and appeals courts are amended to conform with this judgment.
AMENDED AND AFFIRMED.
DIXON, C.J., dissents with reasons.
MARCUS, J., dissents and assigns reasons.
BLANCHE, J., dissents for reasons assigned by DIXON, C.J.
DIXON, Chief Justice (dissenting).
I respectfully dissent. The issue here is whether New Orleans firemen should have their state supplemental pay added to their base pay for the computation of overtime pay. The rules of the city civil service do not permit it, defining "Base Pay" as weekly pay "... determined in accordance with the pay plan in effect ... regardless of any provisions or appropriation for any different salary rate or mode of payment for any position...." Rule IV, § 1.3 of the City Civil Service Rules.
The state supplemental pay for firemen (R.S. 33:2002(A)) cannot reasonably be equated to "minimum wages" referred to in Art. 6, § 14 of the Const. of 1974. On the other hand, this "extra compensation" is exactly that; or, as it is called in the title of Sub-Part B.1 of Part II of Chapter 4 of Title 33 of the Revised Statutes, a part of the legislative plan for "Supplemental Salaries." The Constitution of 1974 permits, in Art. 10, § 10, legislative supplementing of state police and wildlife officers' pay plans (prompted by the Louisiana Civil Service League v. Forbes, 258 La. 390, 246 So.2d 800 (1971), which held unconstitutional supplemental pay by the state for state police) but not supplementary pay plans for firemen. Supplemental state pay for both state police and New Orleans firemen was prohibited by the same provisions of the 1921 Constitution, Art. 14, § 15. See New Orleans Firefighters Assn. Local 632 v. City of New Orleans, 263 La. 649, 269 So.2d 194 (1972).
Since the state supplement involved is unconstitutional, and is excluded by the civil service definition of "Base Pay," it should not be included in the computation of overtime pay.
MARCUS, Justice (dissenting).
La.Const. art. 6, § 14 provides that: "No law requiring increased expenditures for wages [or] working conditions ... except a law providing for ... minimum wages [or] working conditions for firemen ... shall become effective ... until the legislature appropriates funds for the purpose to the affected political subdivision and only to the extent and amount such funds are provided." (Emphasis added.) By virtue of this provision, the legislature may constitutionally provide firemen with supplemental pay as provided by La.R.S. 33:2002, but only insofar as the legislature appropriates the funds for that purpose. This constitutional provision does not allow the legislature to impose upon the City of New Orleans the increased expenditure which the calculation of overtime predicated on the state supplemental pay and the base pay of the firemen will incur.
Article 6, § 14 also permits the state to establish minimum wages for firemen without appropriating the funds to the City of New Orleans and the legislature has chosen to do so. La.R.S. 33:1992. The state may also establish a standard with regard to the maximum number of hours that a fireman may work and may require that the City of New Orleans pay overtime for any hours that its firemen work in excess of those hours. The state has also chosen to impose this standard. La.R.S. 33:1994. In each instance, however, the pay plan established by the Civil Service Commission of New Orleans is far in excess of these minimum requirements that have been established by the state. See Rule IV, §§ 1.3 & 10.2 of the City Civil Service Rules. There is no *416 constitutional authority for the state to impose additional burdens upon the City of New Orleans other than those exceptions enumerated in La.Const. art. 6, § 14 unless the legislature choses to appropriate the funds.
By requiring the City to include state supplemental pay to the basis for computing overtime pay, the majority as a practical matter has imposed an increased expenditure on the City of New Orleans. I consider this to be in violation of La.Const. art. 6, § 14 because the state has not appropriated funds to cover this expenditure nor is it a permissible constitutional exception.
Accordingly, I respectfully dissent.
NOTES
[1] This was the second suit filed in connection with the calculation of New Orleans firemen's overtime wages. The first was filed by the Civil Service Commission against the city's chief operating officer to enjoin him from including state salary supplements in his calculation of the firemen's weekly overtime pay. In that suit, the court of appeal held that the city had no authority on its own to alter the manner specified by the Civil Service Commission for the calculation of overtime wages. Civil Service Commission v. Rochon, 374 So.2d 164 (4th Cir.1979). The court suggested that the proper manner for the city and firemen to raise the issue would be for them to file suit against the commission to compel alteration of the pay plan. 374 So.2d at 167. As a result of that statement, no review was requested over the decision, and the present suit was filed.
[2] Rule IV, § 10.2(C) of the City Civil Service Rules provides:

"Non-exempt uniformed fire personnel who work a 48-hour work week shall receive overtime compensation at the rate of time and one-half the employee's regular hourly base rate of pay for all hours worked in excess of 12 consecutive hours on a shift or 48 hours in a week. (Amended April 27, 1977 and effective February 26, 1979.)"
Rule IV, § 1.3 provides, further:
"The pay of all positions in the classified service shall be determined in accordance with the pay plan in effect and in accordance with the provisions of the Civil Service Law regardless of any provisions or appropriation for any different salary rate or mode of payment for any position. The Base Pay of those employees paid on a bi-weekly basis shall be computed by multiplying the appropriate monthly salary step in the salary range by twelve and then dividing this product by twenty-six. The Base Pay of those employees paid on a weekly basis shall be computed by multiplying the appropriate monthly salary step in the salary range by twelve and then dividing this product by fifty-two. (Amended April 27, 1977)."
[3] Unlike the trial judge, we do not find that the pay plan's provisions are ambiguous in their treatment of the state salary supplement. The clear import of these rules, combined with the City Civil Service Commission's consistent action, is that the state supplement is not to be included in the "base rate of pay." Thus, we are unable to rest our inquiry upon a simple application of the constitutional provision that the city may enter into any contract it wishes with labor organizations so long as it does not conflict with a valid Civil Service Commission Rule. La.Const. Art. 10 § 10(A)(1). For this reason, we are called upon to make an adjudication that reaches the complex questions of the balance of constitutional power.
[4] In discussion of the Lennox Amendment, Delegate Dennery and Delegate Segura engaged in the following colloquy:

Mr. Dennery: Are you aware, sir that this provision also excludes firemen and policemen from general civil service provision?
Mr. Segura: I don't really understand what you mean.
Mr. Dennery: As I read the committee proposal, it excludes a law providing for civil service for firemen and policemen. In other words, if there is a civil service law, as there presently is by constitution in the city of New Orleans which covers firemen and policemen, this provision would apparently exclude firemen and policemen from the civil service system in the city of New Orleans.... 7 Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts 1482 [hereinafter referred to as Records].
Discussion of the Rachal Amendment, which would have exempted cities with comprehensive civil service plans from the legislature's plenary power, produced the following dialogue:
Mr. Rachal: The effect of my amendment then, is to permit those municipalities with what I call comprehensive Civil Service programs not to be placed under the mandate of the section 16 as it is now required....
Mr. Duval: Mr. Rachal, to make sure I understand your amendment, let me ask you, in the event a city's firemen and policemen were under a comprehensive civil service plan, under your amendment does that mean that the legislature would not be able to pass laws affecting the salaries or the compensation of these people?
Mr. Rachal: That's right, it would exist the same as the legislature does not now pass laws affecting state of civil service employees.... My amendment is concerned only with municipalities with comprehensive civil service programs, which include fire and police, of which there is only one.
Mr. Stovall: Mr. Rachal, might not we better deal with this issue under the civil service provision which will be presented later to this convention. Could not we deal with it in a more comprehensive and objective way at that time?
Mr. Rachal: Well, Im' afraid, Mr. Stovall, if we wait until that time we may have gotten ourselves locked into something under this section in this article and my ... I'm not certain what will remain by the time we finish it.
It could well be that this amendment would have no effect, but I don't see that the ... I, and those who support my concept, can wait until that time if we be ... if what I am trying to get done is precluded by this section. I think we need to establish the protection at this point....
Records, p. 1497.
[5] Examples of this may be found in the Statement of Delegate Stinson at page 1483 of the Records, where he stated that "It's a statewide protection and security that the citizens of Louisiana are entitled to," and at page 1485, where Delegate DeBlieux echoed that sentiment:

I think that when it comes to firemen and policemen, there's a little more involved than just local government; that's when human rights, human lives and human property is involved. I don't know of any fireman or any policeman who has ever refused to go outside of his area to answer a call. I just want you to take that into consideration. I think the lives of the whole state, the property of the whole state is involved in this issue, and I think as a result of that, the legislature ought to have something to say about how they operate so that we can be sure that the lives and property of all of our citizens are protected as much as possible.
Delegate Roy agreed on page 1489: "When you deal with something on a statewide basis like for fire and police protection, all citizens of this state, all over that state are entitled to the protection...."
[6] Delegate Rayburn commented that "that's the only reason that you ... the legislature has helped the firemen and policemen as much as they have. They couldn't get help locally; they had no recourse; they had no other place to go but the legislature."
[7] Delegate Stinson expressed this concern: "Suppose your car caught on fire and the firemen said, You're from Bossier Parish. I'm not going to put your fire out. Coming down here I pass through twenty-five or thirty towns and cities. I'm an outsider. I'm a visitor, but I'm entitled to the protection. It's a statewide protection and security that the citizens of Louisiana are entitled to."
[8] Delegate Stinson commented: You know you've got to have some assurance of security. It's worse now than ever before.... That is security which now is needed more than ever, and it is going to get worse. Records at 1484. And, Delegate Ullo was concerned about our "day and age of crime in the streets." Records at 1489.
[9] These include the "power to adopt rules for regulating employment, promotion, demotion, suspension, reduction in pay, removal, certification, qualifications, political activities, employment conditions, compensation and disbursements to employees, and other personnel matters and transactions; to adopt a uniform pay and classification plan; to require an appointing authority to institute an employee training and safety program...." La.Const. art. 10 § 10(A)(1).
[10] Our conclusion is further strengthened by an examination of the discussion surrounding the "state police" amendment proposed by Delegates Flory and Hernandez to Article 10 § 10. This amendment added the language that was to become the last sentence of Article 10 § 10(A)(1): "Nothing herein shall prevent the legislature from enacting laws supplementing these uniform pay plans for sworn, commissioned law enforcement officers of the Division of State Police, Department of Public Safety and regularly commissioned officers of the Enforcement Division of the Department of Wildlife and Fisheries."

The discussion of this proposal was centered almost exclusively on what was considered by the delegates as its "remedial" nature. The chief impetus for its enactment was to "bring this constitutional provision in line" with what had already been done. Although no specific references by name were made to the previously adopted provisions, the delegates were cognizant that they had already provided the legislature with power to assure adequate salaries for local law enforcement officers via minimum wage legislation. Thus, the amendment reserving the legislature's power to provide supplemental salaries for state policemen was needed to afford them similar protection. 9 Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts p. 2712-15. See in particular, the statement of Delegate Kelly at p. 2713.