MAX N. TOBIAS, JR., Judge.
hThe plaintiffs, Concerned Classified City Employees, Inc. (“CCCE, Inc.”), Karen Marie Davis, Cynthia Cuttino Edwards, and Joycelyn Johnson Evans (collectively, the “City Employees”), devolutively appeal the trial court’s judgment dismissing their lawsuit against the defendants, the Civil Service Commission for the City of New Orleans (the “Civil Service Commission”) *826 and the City; of New Orleans (the “City”), without prejudice, on exceptions of no cause and no right of action. For the reasons that follow, we affirm the trial court’s judgment.

Factual Background and Procedural History

CCCE, Inc. is a Louisiana non-profit corporation, alleged to comprise current and retired permanent classified civil service employees of the City. Ms. Davis, Ms. Edwards, and Ms. Evans are allegedly residents of the Parish of Orleans.[1] CCCE, Inc. and the City Employees jointly filed suit against the Civil Service Commission and the- City on 24 September 2014 seeking declaratory and injunctive relief. In their petition, the plaintiffs allege that under the Louisiana Constitution of 1974, only two types of local civil services systems are authorized: (1) the constitutionally created civil service system (or “state civil service system”) ^provided by La. Const. Art. X, Part I, §§ 1(B) and 4(A), which is only operable in cities having a population exceeding 400,000 individuals; and (2) a “city civil service system” pursuant to La. Const. Art. X, Part I, § 15 for cities having less than 400,000 in population who vote for such a system. The plaintiffs aver. that if, according to the latest decennial federal census, the population of a city exéeeds 10,000, but does not surpass 400,000 individuals, the Louisiana Constitution does not authorize’ a constitutionally created civil service system unless a local option election is held in accordance with La. Const. Art. X, Part I, § 14(A), in which a majority of the electors elect to have such a system in their city.
According to the plaintiffs, because the population of the City fell below the threshold requirement of 400,000 individuals set forth in La. Const. Art. X, Part I, §§ 1(B) and 4(A), and.no local option election was ever been held determining that the electors desired to have a “state civil service system,” the Civil Service Commission ceased to exist by operation -of law, and was automatically and immediately supplanted by the successor commission provided for in the City’s home rule charter, which charter was “adopted by the vote of the people,” effective 1 May 1954, and amended on several occasions. Simply put, the plaintiffs contend the Civil Service Commission now operates under the applicable provisions of the City’s home rule charter.[2]
*827 |sOn 25 August 2014, the Civil Service Commission amended- its rules governing the terms and conditions of employment of the City’s civil service employees under the title of “Great Place to Work Initiative.” According to the plaintiffs, these new civil service rules, which would appear to substantially impact, their rights and the rights of other classified city civil service workers, to the benefits and protections of the civil service merit system, were not lawfully adopted in accordance with Article VIII of the City’s home rule charter. Specifically, the plaintiffs aver these rules were unlawfully adopted by the presently constituted.five-person Civil Service Commission by a three-to-one vote, with one abstention, and not by,a seven-member Commission with a four or more, majority vote as delineated and mandated by Section 9-107 of the City’s home rule charter. In short, the plaintiffs aver that because the new rules failed to receive. four or more votes, they are invalid and unlawful.
Accordingly, the plaintiffs prayed that judgment be issued
declaring that Article' VIII of the New Orleans Home Rule Charter is now in full force & effect rather than La. Const. art. ‘X § 1(B) and that the rules of the New Orleans Civil Service’ Commission which were adopted on August 25, 2014 are null and void.
The plaintiffs further prayed that a permanent injunction be issued
enjoining, restraining and prohibiting the defendants from enforcing, applying and/or implementing the changes to the .rules of the New Orleans Civil Service Commission which were adopted on August 25,2014.
I/The City responded to the plaintiffs’ petition by filing an exception Of no cause of action and an answer averring that the Louisiana Constitution of 1974 permanently'-established a constitutionally created Civil Service Commission for the City, regardless of any future fluctuations in the City’s population. Specifically, the City posits that La. Const. Art. X, Part 1, § 4(B) mandates that the City’s Civil Service Commission have five commissioners[3] regardless of the City’s population and, because a home rule charter government is unquestionably limited by the provisions of the Constitution and cannot supplant it, the' plaintiffs’ petition, or any possible amendment thereto, does not and cannot state a cause of action upon which declaratory or injunctive relief can be granted in this ease.
The Civil Service Commission responded to the plaintiffs’ petition by filing an exception of no right of action averring that the plaintiffs lack standing to seek removal of the five current civil service commissioners on the basis that a purported condition precedent to the exercise of their authority the population requirement) no longer obtains and that new commissioners' must be appointed under á different provision of the City’s home rule charter. According to- the Civil Service Commission, absent allegations that any one of them had been adversely .affected by the actual application of a rule, statute, municipal ordinance, or law pursuant to La. C.C.P. art. 1872,[4] what the.plaintiffs’ petition essentially seeks is *828 to | shave the court rule on the legal status of a state entity, which the Civil Service Commission asserts the law does not afford to these particular plaintiffs the right to do. Specifically, the Civil Service Commission maintains that pursuant to La. R.S. 42:76,[5] any challenge to a government officer’s right to hold office, if coming from any source other than an individual claiming to be entitled to that same office and suing in a quo warranto action, must be asserted by either the governor or the attorney general of the State of Louisiana. Additionally, the Civil Service Commission contends that because the plaintiffs’ petition maintains that each of the present commissioners “unlawfully holds or exercises or attempts to remain in possession of any public office or franchise within this state,” La. R.S. 42:76 applies and, consequently, they lack standing to pursue the asserted claims.
The defendants’ exceptions came for trial on 27 February 2015. After hearing and considering the oral argument of counsel, the trial court granted the City’s exception of no cause of action and the Civil Service Commission’s |f,exception of no right of action thereby dismissing without prejudice the plaintiffs’ petition for declaratory and injunctive relief and at the plaintiffs’ costs. A judgment to this effect was signed on 2 March 2015.
From this judgment, the plaintiffs appealed.

Discussion

The dispositive issue presented by this case is whether or not the Louisiana Constitution of 1974 permanently established a Civil Service Commission in the City. Resolving that the Louisiana Constitution did establish a permanent Civil Service Commission in the City, we find the trial court properly granted the City’s exception of no cause of action and affirm its dismissal of the plaintiffs’ petition for declaratory and injunctive relief.[6]
The action may also be brought by the governor appearing in proper person or through the attorney general of the state or other counsel he may select.
*829 Article X, Part I, §§ 1(A) and (B) of the Louisiana Constitution of 1974 states:
§ 1. Civil Service System
(A) State Civil Service. The state civil service is established and includes all persons holding offices and positions of trust or employment in the employ of the state, or any instrumentality thereof, and any joint state and federal agency, joint state and parochial agency, or joint state and municipal agency, regardless of the source of the- funds used to pay for such employment. It shall not include members of the state police service as provided in Part IV of this Article or persons holding offices and positions of any municipal board of health or local governmental subdivision.
|7(B) City Civil Service. The city civil service is established and includes all persons holding offices and positions of trust or employment in the employ of each city having over four hundred thousand population[7] and in every instrumentality thereof. However, paid firemen and municipal policemen may be excluded if a majority of the electors in the affected city voting at an election held for that purpose approve their exclusion. The election shall be called by the municipal governing authority within one year after the effective date of this constitution^[8]]
The plaintiffs seek to have us interpret these provisions to mean that, when the most current decennial federal census reveals that a city’s population has dropped below 400,000 individuals, the Civil Service Commission automatically ceases to exist by operation of law and the provisions of the City’s home rule charter immediately take effect. We find this proposed interpretation leads to an absurd result and is in direct conflict with the purpose and intent of the constitutional provisions at issue; ie., the potential instability in the administration, rights, and status of municipal civil service employees when the governing authority of the city’s civil service is subject to change with each new decennial census.
“The function of. the court, in construing a constitutional provision, is to ascertain and give effect to the intent of the people who .adopted it. Before gratification, the draft constitution of 1974 was a mere proposal, without force or effect. The political act that made the Louisiana Constitution of 1974 binding was the vote of the people; it is the understanding that can be reasonably ascribed to that voting population as a whole that counts.” Succession of Lauga, 624 So.2d 1156, 1164-65 (La.1993)(citing Devlin, Privacy and Abortion Rights Under the Louisiana State Constitution: Could Roe v. Wade Be Alive and Well in the Bayou State, 51 La.L.Rev. 685, 689-90; City of New Orleans v. Scramuzza, 507 So.2d 215 (La.1987); Board of Comm’rs of Orleans Levee *830 Dist. v. Department of Natural Resources, 496 So.2d 281 (La.1986); Bank of New Orleans & Trust Co. v. Seavy, 383 So.2d 354 (La.1980); Chehardy v. Democratic Executive Comm., 259 La. 45, 249 So.2d 196 (1971)). Moreover, when a provision of the constitution is clear and unambiguous, it should be applied as written. Lauga, 624 So.2d at 1166. To the extent possible, “all provisions should be construed together so as to harmonize in their application, if possible,, with a view to giving effect to each and every provision insofar as it shall be consistent with a, construction of the instrument as a whole.” Id. [Citations omitted].
Regarding the intent and purpose of Article X, Part I, §§ 1(A) and (B), their text and meaning are clear according to a fair and reasonable interpretation of the provisions when read in para materia: i.e., to establish .a permanent civil service system for the state[9] and, in each city whose population exceeds four hundred |¡thousand, a. city civil service system.[10] Historically, “[b]ecause of the tumultuous history of civil service in Louisiana, detailed provisions on civil service are included in the our constitution so that the merit system can be repealed or amended only by a vote of the people, to protect against ‘repeal or weakening amendments and sabotage by a temporary majority vote of a spoils-minded and partisan legislative faction.’” Civil Service Comm’n of the City of New Orleans v. City of New Orleans, 02-1812, p. 6 (La.9/9/03), 854 So.2d 322, 327-328.
-It is undisputed that in 1973-1974 when ..the Louisiana Constitution was drafted, and ratified by a vote of the people on 20 April 1974, the City was the only city in the state whose population exceeded 400,000 individuals. Accordingly, pursuant to the provisions set forth above in Article X, Part I, § 1(B), a permanent Civil Service Commission was established and, in effect, mandated for the City. Moreover, once a city’s population exceeds the 400,000 population threshold and a Civil Service Commission is established, as it was in the City, because the applicable provisions are devoid of a mechanism to remove the Civil Service Commission, the only reasonable conclusion is that, once established, the delegates of the Constitutional Convention intended for the City’s Civil Service Commission to remain intact, governed by the provisions relative thereto, irrespective of possible fluctuations to the city’s population from census to census.
*831 |inThe record of the debates at the Constitutional Convention of 1973 pertaining to the drafting of the particular sections in Article X at issue . confirm our interpretation as being consistent with the understanding of the delegates.[11] The verbatim transcripts of the debates make it clear that the delegates intended that the 400,000 population requirement was only to apply to the City and would apply in perpetuity. More specifically, Delegate Zervigon stated:
Mr. Chairman and delegates, most of the people who have gotten up and spoken before you, today, have spoken against Amendment No. 1 of Mr. Floras. I’d like to speak, primarily, against Amendment No. 2 because very little of it has been brought to your .attention. Amendment No. 2 is aimed solely and only, as I read it, at New Orleans. What it would do to the present constitution is to raise the ceiling on a mandatory city civil service from- 250,-000 to 400,000. Now, the reason for that was expressed by Mr. Avant in a question the other day was that if you left it at 250,000, you might make changes in the Baton Rouge city civil service system. Rather than do that, because they knew that the citizens of Baton Rouge would object to changes in their city 'civil, service system, they raised it to 400,000, and then proceeded to make vast changes in .the city civil service system of New Orleans.[12]. .
Further debate on the amendments took place on' 8 December 1973, wherein Delegates Jack, Zervigon and J. Jackson gave the following statements, in pertinent part:
^Delegate Jack:
As Mr. Flory explained, the reason for this change in the figure to four hundred thousand instead of1 that two hundred and fifty thousand, Baton Rouge, Shreveport, and then there’ll be other cities that would be, in a few years, placed in the civil service alone [sic] with New Orleans.... The reason it used to be two hundred and fifty thousand was back when there wasn’t any if s or and’s [that it applied only to New Orleans], and I imagine that figure first started in 1940. At that time I remember Shreveport was ninety-six or seven thousand ....
Delegate Zervigon:
Mrs. Chairperson and delegates, I have no objection to changing the number from two hundred and fifty thousand to four hundred thousand so as not in a back-handed way .to affect Mr..Jack’s hometown, or Baton Rouge, or something like that — if that’s really the intention— Let’s -isolate New Orleans to four hundred thousand, and then every change that’s made in the remainder of the article, affects only. New Orleans.
*832 So, I just want to tell you that I, personally, am going to vote for the four hundred thousand because I have no intention of changing anybody else’s system ....
Delegate J. Jackson:
... As it relates to the amendment, I have no objections to it because based on some conversation, particularly two days ago, I do recognize that if you kept it at two hundred fifty thousand, that that may have some effects on some existing civil service system which I don’t know the ramifications of. But I do know that when you do raise it to the four hundred thousand, that any amendment addressing itself to ... municipal, fire, and policeman system ... will directly relate it, as Mrs. Zervigon said, to the city of New Orleans.... [13]
|12It is clear from the record of the debates pertaining to the adoption of Article X, Part I, §§ 1(A) and (B) that the intention of the delegates in favor of the amendments was to prevent the City from ever operating without a Civil Service Commission. Moreover, if it had been the drafters’ object to limit either the duration for which the City’s Civil Service Commission would exist or to allow the City to determine when it preferred to have a Civil Service Commission, the Constitutional Convention could have done so by including specific provisions to this effect. They did not. Consequently, we conclude that by increasing the population requirement from 250,000 individuals to 400,000 the delegates intended to establish a permanent Civil Service Commission for the City.
Further support for our conclusion that the delegates intended for the City’s Civil Service Commission to be permanently established is found in Article X, Part I, §§ 14(A) and (B), which provides certain cities with the option to elect by majority vote to establish a civil service in accordance with Part I of Article X, and that once established, the civil service is permanent:
§ 14. Acceptance of Act; Other Cities, Parishes, City and Parish Governed Jointly
(A) Local Option. Each city having a population exceeding ten thousand but not exceeding four hundred thousand, each parish, and each parish governed jointly with one or more cities under a plan of government, having a population exceeding ten thousand, according to the latest official decennial federal census, may elect to be governed by this Part by a majority vote of its electors voting at an election held for that purpose. The election shall be held by the city, the parish, or the city-parish, as the case may be, upon (a) the adoption of an ordinance by the governing authority calling the election; or (b) the presentation to the governing authority of a petition calling for such an election signed by electors equal in number to five percent of the registered voters of the city, the parish, or the city-parish, as the case may be.
11a(B) Acceptance. If a majority of the electors vote to adopt this Part, its provisions shall apply permanently to the city, the parish, or the city-parish, as the case may be, and shall govern it as if this Part had originally applied to it. In such case, all officers and employees of the city, the parish, or the city-parish, as the case may be, who have acquired civil service status under a civil service system established by legislative act, *833 city charter, or otherwise, -shall retain that status and thereafter shall be subject to and be governed by this Part and the rules and regulations adopted under it. [Emphasis supplied.]
To reach a conclusion that the delegates did not intend for the Civil Service Commission it established (and reconfirmed) in the City to be permanently governed by Part I of Article X, does not :comport with (and arguably contradicts) the express provisions of § 14(B), which mandates that those qualified cities who elect to be governed by Part I are to be so governed permanently “as if this Part had originally applied to it.” As clearly indicated by the Constitutional Convention debates noted heretofore, Part I originally applied to the City. Accordingly, we find the only reasonable interpretation of Article X, Part I, §§ 1(B) and 14(B), when read in para materia, is that the delegates intended, upon ratification of the Louisiana Constitution of 1974, to permanently establish a Civil Service Commission in the City. Thus, the trial court properly determined that the petition of the plaintiffs, CCCE and the City Employees, failed to state a cause of action upon which declaratory or injunctive relief can be granted in this case.
CONCLUSION
For the foregoing .reasons, we affirm the trial court judgment dismissing the plaintiffs’ claims for declaratory and injunctive relief.

AFFIRMED.

. In memoranda contained in the record on appeal, the plaintiffs are referred to as current, permanent classified civil service employees of the City.

. In support of their position, the plaintiffs refer to Section 4-1505 of the City’s home rule charter, which states that "should the state cease to provide for a system of personnel administration applicable to the City, tire provisions of Article VIII of this Chapter shall immediately become operable.” Moreover, Article VIII at Section.8-101 provides that “this article shall have effect only in the absence of an applicable state law upon the same subject matter.” According to the plaintiffs, since the City’s population fell below 400,000, Article X, of the Louisiana Constitution ceased to apply as a matter of law, and Article VIII of the City’s home rule charter immediately took effect. In contrast to Article X, Part I, § 4(A) of the Louisiana Constitution, which provides that a local civil service system created pursuant to La. Const. Art. X, Part I, § 1(B) shall be composed of five members, three of whom shall constitute a quorum, Article VIII(a) of the City’s home rule charter states that "the Commission shall consist of seven members who shall be electors of and domiciled in the city.” Additionally, Section 9107 provides, that “all actions taken by boards shall require the affirmative vote of the majority of the existing members thereof, provided that regulations may be adopted only upon the affirmative vote of two-thirds of the existing members thereof.”

. According to the City, as. mandated by La. Const. Art. X, Part I, § 4(B), the Civil Service Commission is comprised, of five members, three constituting a majority.

. La. C.C.P. art. 1872, relative to ‘‘[interested parties [who] may obtain declaration of rights, status, or other legal relations,” provides:
A person interested under a deed, will, written contract or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of con *828 struction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

. La. R.S. 42:76, which pertains to "[a]ctions to try right to office; associations acting as corporations,” provides:
An action shall be brought in the name of the state in any of the following cases:
(1) When any person usurps, intrudes into, or unlawfully holds or exercise or attempts to remain in possession of any public office or franchise within this state.
(2) When any public officer has done, or suffered to be done, an act which under the laws of this state constitutes a forfeiture of his office.
(3) When any association or any number of person act as a corporation without being duly incorporated.
This action shall be brought by the attorney general of the state or by the parish district attorney of the parish in which the case arises against the offender, and the suit shall be filed in the district court of that parish.

. Because we find the plaintiffs’ failure to state a cause of action upon which relief can be granted is dispositive of this case, we do not reach the issue as to whether the CCCE and/or the City Employees have a right of action to assert claims for declaratory and/or injunctive relief against the Civil Service Commission. We note that, pursuant to La. C.C.P. art. 931, evidence is admissible in support of, or against, the exception of no right of action and that the defendant raising the exception has the burden of proving the exception. City of New Orleans v. Board of Directors of Louisiana State Museum, 98-1170, p. 9 (La.3/2/99), 739 So.2d 748, 755. No evidence was introduced at the hearing, either in support of, or against, the plaintiffs’ right to bring this action against the Civil Service Commission.

. The Louisiana Constitution of 1921, in Article XIV, § 15(A)(1), commanded that a system of classified civil service employees be set up for the state and for cities having a population of over 250,000. In the Louisiana Constitution of 1974, the drafters increased the population threshold to 400,000. La. Const. Art. X, Part I, § 1(B).

. Regarding the creation of a City Civil Service Commission, Article X, Part I, § 4(A) of the Louisiana Constitution of 1974 provides:
(A) Creation; Membership; Domicile. A city service commission shall exist in each city having a population exceeding four hundred thousand. The domicile of each commission shall be in the city it serves. Each commission shall be composed of five members, who are electors of the city, three of whom shall constitute a quorum. The members shall serve overlapping terms of six years as hereinafter provided.

. "Civil service is designed to abrogate the 'spoils system’ under which public employees are not selected for employment and promotion on the basis of merit or qualifications for the position but as rewards for faithful political activity and service, so that the job holders and their families become economic slaves of a particular political organization and have to vote and work for the candidates of their faction regardless of the character or qualifications of the candidates.” Civil Service Comm'n of the City of New Orleans v. City of New Orleans, 02-1812, pp. 5-6 (La.9/9/03), 854 So.2d 322, 327 (citing New Orleans Firefighters Ass’n v. Civil Service Comm'n, 422 So.2d 402, 410 (La.1982)) ("Firefighters I") (citing 3 C.E.Dunbar, Jr. Projet of a Constitution for State of Louisiana 500 (1954)).

. The Louisiana Supreme Court has noted that "the prime objectives and purposes of the constitutionally created civil service system are to ensure that non-policymaking, i.e., ‘classified,’ city employees are (1) competitively selected on the basis of merit, free from political influence, and (2) protected from discriminatory dismissal or treatment for religious or political reasons.” Civil Service Comm’n of the City of New Orleans v. The City of New Orleans, 02-1812, p. 6, 854 So.2d at 328 (citing New Orleans Firefighters Ass’n Local 632 v. New Orleans, 590 So.2d 1172, 1175 (La.1991)) ("Firefighters II”) (citing 3 C.E. Dunbar, Jr. Projet of a Constitution for State of Louisiana 504 (1954)).

. Although we do not find ány ambiguity in the constitutional provisions in question, we recognize that the proceedings in the convention which drafted the instrument are valuable aids, and should be given some weight, in determining the purpose, intent, and consequent meaning of provisions for those who find them doubtful. See New Orleans Firefighters Ass'n v. Civil Service Com’n of City of New Orleans, 422 So.2d 402, 407 (La.1982). The delegates to the Constitutional Convention of 1973 debated the amendments to Article X over a ten-day period commencing on 6 December 1973 and continuing on 8, 11-13 December 1973 and 1, 14-15, 18 January 1974. See State of Louisiana Constitutional Convention of 1973' Verbatim Tránscripts, Vol. IX, at 2594-3500.

. State of Louisiana Constitutional Convention of ’1973 Verbatim Transcripts, Vol. IX, 94th Day Proceedings — December 7, 1973, Statement of Delegate Zervigon at 2629-30, See also the appendix for transcript of convention debates regarding Article X, Part I, §§ 1(A) and (B). -

. State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, Vo 1. IX, 95th Day Proceedings — December 8, 1973, Statements of Delegates Jack, Zervigon and J. Jackson, respectively, at 2655-2656.