648 So.2d 343 (1994)
LAFOURCHE PARISH COUNCIL
v.
Jervis B. AUTIN, Mayor of the Town of Golden Meadow, et al.
No. 94-CA-0985.
Supreme Court of Louisiana.
December 9, 1994.
Rehearing Denied January 26, 1995.
*344 Walter I. Lanier, III, John L. Lanier, Pugh, Lanier & Riviere, Edmond L. Deramee, Jr., Ashly B. Simpson, Glenn R. Ducote, Deramee & Deramee, Richard P. Ieyoub, Atty. Gen., James M. Ross, for respondent.
Charles L. Patin, Jr., for amicus curiae La. Mun. Ass'n.
*345 FELICIA TONEY WILLIAMS, Justice Pro Tem.[1]
This case demands examination of the prohibition in the Local Government section of the Louisiana Constitution of 1974 against legislative interference with the structure and organization of local governmental subdivisions operating under a home rule charter, LSA-Const. Art. VI, § 6, and whether this prohibition is violated by Act 314 of 1991 enacting subsection G of LSA-R.S. 33:1415, which legislatively grants to municipalities in parishes of certain populations the authority to appoint members to parish boards and commissions exercising governmental functions within the municipalities.[2]
The Lafourche Parish Council ("LPC") petitioned for declaratory judgment on the constitutionality of the statute after the municipality of the Town of Golden Meadow ("Golden Meadow") attempted to appoint members to the boards and commissions of Lafourche Parish under the authority of LSA-R.S. 33:1415(G). Following a trial on the merits, the district court declared the statute unconstitutional and enjoined its implementation by defendants. On direct appeal from the trial court, we affirm as amended. The statute is not per se unconstitutional since the scope of Art. VI, § 6 does not protect nonhome rule charter local governments. It is, however, unconstitutional as applied to Lafourche Parish.
LSA-Const. Art. VI, § 6 bans the legislature from enacting any law which changes or affects the structure and organization or the particular distribution and redistribution of the powers and functions of a parish or municipality operating under a home rule charter. Lafourche Parish operates under a home rule charter adopted pursuant to LSA-Const. Art. VI, § 5, and § 5(E) mandates that its charter is to provide the structure and organization, the powers, and the functions of its government. LSA-R.S. 33:1415(G), as enacted by Act 341 of 1991, changes and affects both the structure and organization and the particular distribution and redistribution of this § 5 home rule charter local government. Thus, as applied to Lafourche Parish, a parish operating under a home rule charter adopted pursuant to LSA-Const. Art. VI, § 5, LSA-R.S. 33:1415(G) is unconstitutional.

FACTUAL AND PROCEDURAL HISTORY
Pursuant to the powers vested in LPC by its Home Rule Charter of 1976, LPC established various boards and commissions to operate within the territorial limits of Lafourche Parish. Article III of its Home Rule Charter, entitled Organization, Structure and Distribution of Powers and Functions, sets forth in subsection (A)(15)(a) that LPC may establish "parish departments, offices or agencies in addition to those created by this charter; and except as otherwise provided in this charter, prescribe the functions and duties of all departments, offices, and agencies." Accordingly, LPC's Committee on Appointments selects the members of the parish's boards and commissions, subject to final ratification and approval by LPC.
LPC claims its exclusive power to appoint members to its boards and commissions was altered by state legislation enacted in 1991. Act 314 of 1991 amended LSA-R.S. 33:1415 by adding subsection G:
§ 1415. Governing authorities of parishes and municipalities; power to abolish entities created by them; fiscal, budgetary and other controls; terms of members of certain entities

* * * * * *
G. Notwithstanding any provisions of law to the contrary, when a board or commission, other than a hospital service district, whether presently created or hereafter created by the governing authority of any parish, exercises governmental functions within a municipality, the governing authority of the municipality shall appoint *346 a member to such board or commission. The governing authority of the municipality shall also have the power to remove and replace such member. The provisions of this Subsection shall not be applicable to parishes with populations of more than four hundred twenty-five thousand persons and less than four hundred seventyfive thousand persons or to parish library boards.[3]
By letter to LPC dated June 4, 1992, Mayor Jervis B. Autin ("Autin") of Golden Meadow asserted the town's rights under LSA-R.S. 33:1415(G) to appoint members to the parish boards and commissions exercising governmental functions within its boundaries. In response, LPC filed its petition for declaratory judgment and injunctive relief against Golden Meadow and its mayor to prohibit them from making the appointments, asserting the 1991 enactment "changes or affects the structure and organization and/or the distribution of the powers and functions of the Lafourche Parish Council which operates under a Home Rule Charter" and, therefore, violates the Louisiana Constitution of 1974, Art. VI, § 6.
The trial court issued a temporary restraining order on July 20, 1992, directed to all named defendants.[4] Thereafter, on September 15, 1992, the parties consented to the issuance of a preliminary injunction against Golden Meadow and to all other named defendants restraining, enjoining or prohibiting them from either making appointments to or accepting appointments from Golden Meadow or any municipality similarly situated until the constitutionality of LSA-R.S. 33:1415(G) is determined.
On January 26, 1993 and February 12, 1993, LPC amended its original and supplemental petitions to add as defendants the Town of Lockport and the City of Thibodaux, and their mayors.[5] These municipalities declined to participate at trial.[6] The state did not appear but filed a tardy pre-trial memorandum. Hence, the suit proceeded to trial against the three municipalities and their mayors with only Golden Meadow and Autin actively contesting the right of LPC to have its injunction enforced and the statute declared unconstitutional.
The only witness called to testify at trial was Autin. His counsel questioned him regarding the history of the enactment of Act 314 of 1991, and its relationship to Golden Meadow's desire to appoint members to the boards and commissions created by LPC. In response, Autin explained:
A. Well, sometimes back, a few years back when I was serving as Alderman, the Town of Golden Meadow used to submit three names of those that would like to serve on the commissions, commissions that the town taxpayers of Golden Meadow were paying taxes to. And during the days of the police jurors they would acknowledge one of the three names submitted. *347 That went on until the administration of Bobby Tardo and partial administration of Vernon Galliano. And then the Parish Council decided they were going to nominate whoever they pledged, that they pleased to do so and not even ask any of the municipal officials who they'd like to have as representatives on the various boards.... Being that we felt that the governing authority needed to be represented on the various boards that they were paying taxes on, and we needed to talk to people who could represent us when we needed them, brought me to Baton Rouge and asked the Louisiana Municipal Association to draft up legislation that would be approved by the Legislators to give us the opportunity to name the board members that we'd like to serve to represent the taxpayers of Golden Meadow through the municipal government which is the Mayor and the Board of Alderman (sic), and that is what we have presently. That law says what we should do or can do.
Subsequently, Autin explained what he and Golden Meadow desired to accomplish with the legislation:
A. All we are looking for is naming representatives who are supposed to be representing the taxpayers of the Town of Golden Meadow for taxes that they put within the confinements of whatever board that is collecting taxes. If we have an appointment to whatever board that the Town of Golden Meadow is paying taxes to all we ask simply is that we have the opportunity to name that member to represent the taxpayers of Golden Meadow and he would be responsible to the government who is governing authority of Golden Meadow. We're not asking to submit four or five applications or four or five additional. All we're asking for is our voice to be appointed by the people of Golden Meadow.[7]
LPC argued to the trial court that the Louisiana Constitution of 1974 "protects against unwarranted invasions into the internal affairs of the Home Rule," and is designed to prevent the legislature from substituting its judgment for that of the home rule entity. As LSA-R.S. 33:1415(G) violated these protections, it is unconstitutional. LPC asserted that a similar statute was held unconstitutional in Francis v. Morial, 455 So.2d 1168 (La.1984), wherein this court based its determination of unconstitutionality upon the finding that no legitimate police power of the State of Louisiana is furthered by the intrusion into a home rule entity's discretion to make appointments to its departments, boards or commissions. LPC also pointed out that its parish boards and commissions cross municipal geographic and political boundaries, and the residents of Golden Meadow have the right to impress upon their parish councilman those persons who they wish to have appointed to represent them on the parish's boards and commissions.
At the trial's conclusion, the court found LSA-R.S. 33:1415(G) unconstitutional and granted LPC's injunction for the reasons cited in Francis v. Morial, supra. The trial court determined the word "agency" in the parish's Home Rule Charter, Art. III, § (A)(15)(a), covers parish boards and commissions. It also found that giving Golden Meadow the authority to appoint members to parish-wide districts would far exceed the representation interests of Golden Meadow. Instead, it would give the town's appointee influence over citizens throughout the parish. The trial court noted that Golden Meadow has representation in the appointment of persons to the parish boards and commissions "and they have that representation through their Parish Councilman."[8] Consequently, it *348 entered judgment in favor of LPC and against the mayors and municipalities of Golden Meadow, Lockport and Thibodaux. It cast Golden Meadow and its mayor with all costs.
Thereafter, Golden Meadow and Autin directly appealed the ruling of unconstitutionality to this court pursuant to the provisions of LSA-Const. Art. V, § 5(D).[9] The Louisiana Municipal Association filed an amicus brief urging the constitutionality of LSA-R.S. 33:1415(G). The Attorney General also filed a brief, claiming the statute is not facially unconstitutional due to the state's plenary power over non-home rule charter parish governments, and the statute is not unconstitutional as applied to home rule charter parishes generally because the specific powers and functions of the parish's charter must be known to decide whether the statute could be applied unconstitutionally to such an entity. The Attorney General further argues that, as specifically applied to Lafourche Parish's home rule charter, the statute is constitutional as the statute merely conditions the parish's use of the power to exercise governmental functions within a municipality with the reasonable condition that a municipality may make appointments to parish boards and commissions.

LEGAL PRECEPTS
Prior to the adoption of the Louisiana Constitution of 1974, our legislature maintained a "creature" political relationship with the state's parish and municipal local governments. VII Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, September 25, 1973, statements of Delegate Lanier at 1395-96 (1977) [hereafter cited as Records]; Id., Sept. 21, 1973, statements of Delegate Stagg at 1363-64, Delegate Jenkins at 1363; Board of Directors of Louisiana Recovery Dist. v. All Taxpayers, Property Owners, and Citizens of La., 529 So.2d 384, 388 (La.1988); Bradford v. City of Shreveport, 305 So.2d 487, 490 (La.1974); Pyle v. City of Shreveport, 215 La. 257, 263-64, 40 So.2d 235, 238 (1949); State v. Jordan, 207 La. 78, 20 So.2d 543, 545 (1944). See also Comments, "Exclusive Powers of Louisiana Home Rule Municipalities and Parishes," 23 Loy.L.Rev. 961, 962, 972 (1977); Kean, Gordon R., Jr., "Local Government and Home Rule," 21 Loy.L.Rev. 63, 63 (1975); Murchinson, Kenneth M., "Developments in the Law, 1982-1983: Local Government Law," 44 La.L.Rev. 372, 389 (1983); Murchinson, Kenneth M., "Developments in the Law, 1979-1980: Local Government Law," 41 La.L.Rev. 483, 485 (1980). Within a "creature" relationship, the contours of local power are shaped by legislative will and dominance, where local governments exercise only those powers specifically granted to them by the legislature or those powers necessarily incidental to their granted powers. 23 Loy.L.Rev. at 962; 44 La.L.Rev. at 389-390; La Fleur v. City of Baton Rouge, 124 So.2d 374, 379 (La.App. 1st Cir.1960). The legislature asserted legislative supremacy regardless of whether a matter was a statewide concern or a purely local one. 21 Loy. L.Rev. at 65. Our legislature had the right and authority not only to delegate local governmental powers, but also to withdraw them and to impose its will on parish and municipal local governments regardless of their local needs or their capacity to comply with the legislature's mandates. See 21 Loy.L.Rev. at 64; City of New Orleans v. Board of Commissioners of the Orleans Levee Board, 93-0690, p. 5 (La. 7/5/94), 640 So.2d 237 [discussion of Dillon's Rule]; 23 Loy.L.Rev. at 962.
Being dissatisfied with this creature relationship existing between our legislature and local governments, the people of Louisiana desired constitutional reform. They wanted local governmental autonomy through home rule. See Records, Sept. 20, 1973, statements *349 of Delegate Duval at 1345, Delegate Chatelain at 1331 and 1346, Delegate Nunez at 1346, Delegate Perez at 1347, Delegate Womack at 1352; Records, Sept. 21, 1973, statements of Delegate Roemer at 1364; 21 Loy.L.Rev. at 66. The people wanted their local governmental subdivisions to have the freedom and flexibility to manage their local affairs without undue legislative interference. 21 Loy.L.Rev. at 66; Records, Sept. 20, 1973, statements of Delegate Alexander at 1345. The people also wanted to end practices such as where two days of a legislative session were squandered addressing a purely local concern, or where a law on a purely local issue was enacted after legislators from unaffected areas of the state were lobbied by special interest groups. See Records, Sept. 20, 1973, statements of Delegate Arnette at 1335, Delegate Chatelain at 1346; Records, Sept. 21, 1973, statements of Delegate Duval at 1359, Delegate Kean at 1360; Delegate Chatelain at 1360-61, Delegate Stagg at 1363-64, Delegate Zervignon at 1369-70, Delegate Derbes at 1370; Records, Sept. 25, 1973, statements of Delegate Nunez at 1404, Delegate Chatelain at 1405, Berson at 1412-1413. See generally Records, Sept. 20-27, 1973, pp. 1327-1476.
With this historical perspective, 132 delegates representing Louisiana's 3.6 million residents convened at the Louisiana Constitutional Convention of 1973. See Records, Sept. 20, 1973, statements of Delegate Nunez at 1345, Delegate Alexander at 1345; Records, Sept. 21, 1973, statements of Delegate Chatelain at 1361; Records, Sept. 25, 1973, statements of Delegate Chatelain at 1405. These delegates understood that Louisiana's Constitution of 1921 was in need of consolidation.[10] They also were aware that eighty percent of the 532 amendments to the Louisiana Constitution of 1921 pertained to local government, and a revision of that section needed to reflect the metamorphosis in the peoples' philosophy toward the relationship between state and local governments. See Kean, Gordon R., Jr., "Local Government and Home Rule, "21 Loy.L.Rev. 63, 63 (1975); Records, Sept. 25, 1973, statements of Delegate Chatelain at 1405.
These delegates tackled the arduous duty of drafting viable home rule provisions into Article VI, the Local Government portion of the Louisiana Constitution of 1974. The convention's end-product, the provisions on local government and home rule adopted by the delegates for submissions to the peoples' vote, and subsequently ratified by the popular vote of the people, provides in pertinent part:
§ 4. Existing Home Rule Charters and Plans of Government
Section 4. Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when this constitution is adopted. If its charter permits, each of them also shall have the right to powers and functions granted to other local governmental subdivisions.
§ 5. Home Rule Charter[11]

*350 Section 5. (A) Authority to Adopt; Commission. Subject to and not inconsistent with this constitution, any local governmental subdivision may draft, adopt, or amend a home rule charter in accordance with this Section. The governing authority of a local governmental subdivision may appoint a commission to prepare and propose a charter or an alternate charter, or it may call an election to elect such a commission.
* * * * * *
(E) Structure and Organization; Powers; Functions. A home rule charter adopted under this Section shall provide the structure and organization, powers, and functions of the government of the local governmental subdivision, which may include the exercise of any power and performance of any function necessary, requisite, or proper for the management of its affairs, not denied by general law or inconsistent with this constitution.
* * * * * *
§ 6. Home Rule Charter or Plan of Government; Action by Legislature Prohibited
Section 6. The legislature shall enact no law the effect of which changes or affects the structure and organization or the particular distribution of the powers and functions of any local governmental subdivision which operates under a home rule charter.
§ 9. Limitations of Local Governmental Subdivisions
* * * * * *
(B) Police Power Not Abridged. Notwithstanding any provision of this Article, the police power of the state shall never be abridged.
The achievement of these constitutional provisions was the product of protracted convention debates, spanning numerous days.[12] After the committee on municipal and parochial affairs submitted its proposal for LSA-Const. Art. VI, §§ 5 and 6 (which were then designated as §§ 8 and 9), a battle ensued.[13] *351 Committee representatives conveyed to the convention that its proposal was designed to constitutionalize the distinction between the legislature's authority to enact laws pertaining to the powers and functions of local government, and the local government's exclusive right to manage its own internal affairs by controlling the structure and organization of its government and the distribution of its powers. See note 13. Its proposal *352 embraced the concepts set forth in La Fleur v. City of Baton Rouge, supra, which concepts they considered as the heart of home rule. Id.
The case of La Fleur v. City of Baton Rouge, supra, distinguished matters of "structure and organization" from the exercise of "powers and functions," and reserved all matters of "structure and organization" to the home rule entity.[14]La Fleur confronted these issues while analyzing the scope of a provision in the charter of the City of Baton Rouge constitutionalized in Art. XIV, § 3(a) of the Louisiana Constitution of 1921, which provided:
(2) Plan of government. Subject to the constitution and laws of this state with respect to the powers and functions of local government, as distinguished from structure, organization and particular distribution and redistribution of such powers and functions among the several units of local government within the Parish, such plan of government may provide ... (emphasis by La Fleur court, 124 So.2d at 376).
In accordance with this plan, the city had placed the organization and activity of its fire department under its City Council. Subsequently, the legislature enacted a general statute fixing minimum salaries for firemen. The La Fleur court held the statute inapplicable to the City of Baton Rouge finding it did not pertain to powers and functions, but instead pertained to the structure, organization and distribution of such powers which were exclusively granted to the city by the constitution. 124 So.2d at 379-380.
The La Fleur court examined the particular choice of words used in the constitution and decreed that "power" "refers primarily to ability or capacity, which ... is synonymous with inherent or basic authority to indulge in a particular undertaking or provide or perform a certain service," and "function" "may be likened to duty in the sense that it is complementary to power (ability) conferred and, as such, is taken to mean onus or obligation to execute the power granted." 124 So.2d at 378. In contrast, the court found that "`structure' and `organization' and `distribution of powers and functions' relate not to ability, capacity, duty, onus or obligation to perform but to supervision, control and internal arrangement of the component parts of the mechanism or instrumentality through which the power (ability) conferred is exercised in obedience to the function (duty) imposed." Id. Viewing the legislative enactment in context of these meanings, the court determined that incidental aspects of the operation of a fire department, such as wages, concern only the internal arrangement or organization of the component parts of a fire department. Id. It pronounced that such incidental aspects are not powers or functions as they are disassociated from and bear no legal relation to ability, capacity, duty or obligation to provide services normally furnished by firemen. Id.
Delegates at the convention who opposed engrafting into the constitution La Fleur's distinction between matters of "structure and organization" and the exercise of "powers and functions," and a prohibition against state interference in all matters of a home rule charter entity's "structure and organization," introduced amendments which would have eliminated both §§ 5(E) and 6 from Article VI. See notes 13, 15. These amendments fueled numerous debates over whether home rule charter entities should be allowed sole dominion over the internal composition of their government, or whether the constitution should prohibit the legislature from enacting laws affecting and/or changing their structure and organization and the particular distribution and redistribution of their powers and functions. After full deliberation, however, these amendments were repudiated.[15] *353 *354
*355 The convention majority held the same conviction as the committee on municipal and parochial affairs, that it was imperative to constitutionally protect home rule autonomy by guaranteeing the legislature could not intrude upon the structure and organization of home rule charter local governments by expressly limiting its lawmaking power. See notes 13, 15. They believed that, in the absence of such a guarantee, meaningful home rule was not possible, as the internal affairs of home rule charter entities would be subject to change at the whim and discretion of the legislature. Id.
By the voters' ratification of LSA-Const. Art. VI, §§ 5(E) and 6, the structure and organization concepts referred to in La Fleur, as discussed herein, were constitutionalized, albeit not La Fleur's entire holding. See New Orleans Firefighters Association v. Civil Service Commission of the City of New Orleans, 422 So.2d 402 (La.1982). The Louisiana Constitution of 1974 not only distinguishes between "power and function" and "structure and organization," but also prohibits legislative interference in the latter area where home rule charter governments are involved.
Louisiana's current constitution delegates powers and functions to home rule charter governments and grants them the discretion to deploy their powers and functions at a local level. Francis v. Morial, 455 So.2d at 1169. While the legislature has the power to deny or revoke, for charter governments created under Art. VI, § 5, an initial delegation of home rule powers or functions, Art. VI, § 6 prevents the legislature from revoking, changing or affecting a home rule charter government's discretion to deploy its powers and functions unless it is necessary to prevent an abridgement of a reasonable exercise of the police power. Id. Hence, Art. VI, § 6, bestows a guarantee of structural autonomy on § 5 home rule governments. *356 See American Waste v. St. Martin Parish Police Jury, 609 So.2d 201, 202 (La. 1992). It prohibits the legislature from substituting its judgment for that of the home rule charter government's with respect to the arrangement of various offices, departments, agencies and elements of local government, and as to the assignment, allocation or distribution of purposes, work, authority and capacity among them. Francis v. Morial, 455 So.2d at 1171.
Article VI, § 5(E), read in conjunction with § 6, allots to home rule charter local governments exclusive control over the operation, management and internal arrangement of the component parts of its local government. See 44 La.L.Rev. at 391-392. Additionally, due to the definitive limitation in Art. VI, § 6 on the legislature's power, and due to the mandate in Art. VI, § 5(E) for the charter to provide "the structure and organization, powers and functions of" the home rule government, any deficiency in the provisions of a charter adopted pursuant to § 5(E) would not create a residual right in the legislature to enact legislation in this area. The constitution specifically restricts legislative interference in this area of local government domain.
As recognized in Francis v. Morial, supra,[16] Art. VI, § 6 was added to the constitution to protect home rule charter governments from unwarrantable interference in their internal affairs by state government. 455 So.2d at 1171. Hence, unless the constitution elsewhere provides justification for such intrusion, § 6 prohibits any state law from changing or affecting, i.e., producing an alteration in or material influence upon, the local government's structure and organization or the distribution or redistribution of its powers and functions. Id. (emphasis added) As Morial illustrates, this constitutional protection granted to home rule charter governments is so resolute, that the only qualification on their Art. VI, § 6 immunity from state interference, is the constitutional truism set forth in Art. VI, § 9(B), that "notwithstanding any provision of Article VI, the police power[17] of the state shall never be abridged." See 44 La.L.Rev. at 391-392.
When a court is resolving whether a statute should be stricken as an unconstitutional legislative interference with local deployment of home rule charter powers and functions, home rule abilities and immunities are broadly construed and any claimed exception is carefully scrutinized. City of New Orleans v. Board of Commissioners of the *357 Orleans Levee District, supra, at p. 27, 640 So.2d at 252. See also Francis v. Morial, 455 So.2d at 1173 [home rule abilities and immunities should be fairly, genuinely and reasonably construed]. The courts recognize that Art. VI, § 9(B) was not devised to emasculate Art. VI, § 6.[18] Rather, it is a counterbalance, to preclude the danger that the powers and defenses afforded local governments would be used to deprive the state government of its necessary inherent powers. Id., 455 So.2d at 1172. The delegates to the convention and ratifiers of the constitution intended for it to harmonize the home rule powers granted local governments in the other sections of Art. VI, with a basic reservation to the state of the residuum of the police power required to initiate legislation necessary to protect and promote the lives, health, morals, comfort and general welfare of its people as a whole. City of New Orleans v. Board of Commissioners of the Orleans Levee Board, at pp. 19, 24-25, 640 So.2d at 249, 251.
Article VI, § 9(B) is purely a statement of fact, a positive reaffirmance of the supremacy of the state's police power. It is to be construed in harmony with the limitation on the state's legislative powers set forth in Art. VI, § 6. See Id., at p. 25, 640 So.2d at 251. Article VI, § 9(B) is not construed so as to destroy that power. See Id. If § 9(B) was interpreted more broadly, the guarantees in Article VI of autonomy to home rule charter local governments would be meaningless.

APPLICATION OF LEGAL PRECEPTS TO THE FACTS
Act 314 of 1991, enacting LSA-R.S. 33:1415(G), is unconstitutional as applied to Lafourche Parish. It is not facially unconstitutional since the scope of Art. VI, § 6 does not include non-home rule charter local governments. However, it is unconstitutional as applied to Lafourche Parish because the parish operates under a home rule charter adopted pursuant to Art. VI, § 5.
While the legislative power of the state is vested in the legislature by virtue of Art. III, § 1, the power is tempered by the Constitution's Local Government section. Article VI delegates self-executing powers and functions to home rule charter governments. It also divests the legislature of the power to enact legislation which intrudes upon the structure and organization and the particular distribution of the powers and functions of home rule charter local governments. LSA-Const. Art. VI, § 6. It limits the legislature's authority to legislate regarding the internal deployment of home rule charter governments' powers and functions or its internal arrangement of and control over the structure and organization of its government.
Lafourche Parish's home rule charter, adopted pursuant to Art. VI, § 5, purports to authorize the establishment of parish boards and commissions. Pursuant to its charter's terms, LPC established various boards and commissions to operate within its territorial limits and established a Committee on Appointments to select members to these boards and commissions subject to final ratification and approval by LPC. Under the aegis of Art. VI, §§ 5(E) and 6, LPC rightly considered the method of selecting the members of its boards and commissions to be its sole province.
LSA-R.S. 33:1415(G) effectively authorizes the municipalities of Golden Meadow, Thibodaux and Lockport to each appoint one member to all of the various boards and commissions of Lafourche Parish which operate within their borders. LSA-R.S. 33:1415(G) effects the parish's administrative authority over its own boards and commissions, by blatantly changing and affecting the distribution of Lafourche Parish's powers and functions, therefore, it constitutes a patent violation of Art. VI, § 6. Cf. Francis v. Morial, *358 455 So.2d at 1174. It also affects and changes the structure and organization of LPC's government by superseding its home rule discretion to manage, control and arrange its internal affairs. It dictates the process of selecting board members and, possibly, controls the method of selecting the majority of the members of the boards and commissions. Therefore, the statute interferes with incidental aspects of the operation of parish government, changing its organization and its methods of managing the internal operations of its government, in violation of Art. VI, § 6.
When Art. VI, § 6 was applied to a § 4 home rule charter entity in Francis v. Morial, a relatively similar statute to LSA-R.S. 33:1415(G) was held unconstitutional. The legislation in Morial effectively gave local governments neighboring the New Orleans International Airport the authority to appoint members to the New Orleans Aviation Board. After determining the statute violated Art. VI, § 6, this court found the constitutionality of the statute was not protected by Art. VI, § 9(B). The operation of the statute did not "tend in some degree to prevent an offense or evil or otherwise to preserve public health, morals, safety or welfare," and it did not appear to have any real or substantial relation to an appropriate object of the police power. 455 So.2d at 1174. Instead, the statute "merely redistribute[d] the power and function of selecting a minority of the aviation board from the New Orleans officials to those of three other local governments." Id. Consequently, even if the statute had accomplished a valid police power object, this court concluded that the small benefit conferred upon the people of the state was not commensurate with the interference and burdens that the statute placed on the home rule charter government. Id. Therefore, the statute, the operation of which only effected the New Orleans Aviation Board, was held unconstitutional.
Likewise, this court finds that LSA-R.S. 33:1415(G) creates an odious burden on local governments operating under a home rule charter adopted pursuant to Art. VI, § 5, and does not qualify as a reasonable or a necessary exercise of the state's police power. It does not set forth a compelling state interest, and its subject is not a matter of statewide concern rightfully amenable to police power regulation. Nor does the operation of the statute "tend in some degree to prevent an offense or evil or otherwise to preserve public health, morals, safety or welfare." Rather, it provides the citizens of municipal areas of the parish an unfair representational advantage over the citizens in rural areas of the parish. It also upsets the management, control and internal stability of the structure of the parish's government. Moreover, even if the statute accomplished a police power objective, it is not "necessary to protect and promote the lives, health, morals comfort, and general welfare of its people as a whole." City of New Orleans v. Board of Commissioners of the Orleans Levee Board, 640 So.2d at 251. Therefore, the statute is not a reasonable or a necessary exercise of the state's police power and Art. VI, § 9(B) does not protect it from the prohibitions of Art. VI, § 6.[19]
Since the provisions of LSA-R.S. 33:1415(G) apply equally to parish governments operating under a home rule charter as to those operating without a home rule charter or plan of government, and since this case dealt only with the statute's application to Art. VI, § 5 home rule charter governments, the trial court's judgment declaring LSA-R.S. 33:1415(G) unconstitutional requires clarification and limitation. Act 314 of 1991 which enacted LSA-R.S. 33:1415(G) is facially unconstitutional only in its application to Art. VI, § 5 home rule charter parish governments.[20]
Accordingly, the trial court's judgment declaring LSA-R.S. 33:1415(G) unconstitutional *359 and enjoining its enforcement by defendants is affirmed as amended.
AFFIRMED AS AMENDED.
WATSON, J., concurs in the result.
NOTES
[1] Judge Felicia Toney Williams, Court of Appeal, Second Circuit, participating as Associate Justice Pro Tempore, effective September 1, 1994.

Calogero, C.J., not on panel. Rule IV, Part 2, § 3.
[2] The provisions of LSA-R.S. 33:1415(G) apply equally to parish governments operating under a home rule charter and to those operating without a home rule charter or plan of government.
[3] The parties did not contest that the population of Lafourche Parish is less than 425,000 and, therefore, the statute applies to it.
[4] The original petition also named as defendants: Ambulance Service District No. 1, Lafourche Parish Communication District, Lafourche Parish Tourist Commission, Fire Protection District No. 3, Coastal Zone Management Advisory Board, Lafourche Parish Community Action Agency Advisory Board, Lafourche Parish Drainage District No. 1, Lafourche Parish Home Mortgage Authority, Lafourche Parish Recreation District No. 3, Lafourche Parish Water District No. 1, Lafourche Parish Commission for Women, the Housing Authority for Lafourche Parish, and Special Education District No. 1.

Prior to trial, these parish boards and commissions were dismissed from the suit by the agreement of the parties.
[5] The petition was amended because, on January 7, 1993, Autin and Golden Meadow had filed a motion to dissolve the preliminary injunction and/or for injunctive relief. Their motion asserted that, prior to the signing of the consent judgment, they had filed dilatory and peremptory exceptions objecting to the nonjoinder of necessary and indispensable parties. They claimed they had premised their agreement to the consent judgment upon LPC's assertion that it would amend its petition to bring in as indispensable parties the mayors and the municipalities of Lockport and Thibodaux, as they are similarly situated municipalities.
[6] To avoid unnecessary legal expenses and costs, Thibodaux, Lockport and their mayors requested to be relieved of further participation at trial. After obtaining their agreement to be bound by the court's finding as to the constitutionality of the statute, the trial court relieved them of further court appearances.
[7] Autin clarified that Golden Meadow did not wish to make additional appointments. Rather, it wanted to name one of the appointees to each parish board and commission which effects Golden Meadow and its taxpayers. Autin was questioned about the dilemma which would occur if the three municipalities, Golden Meadow, Lockport and Thibodaux, controlled the appointment of three members of five member parish boards or commissions, i.e., where the municipalities would have a majority control over the parish boards and commissions. In response, Autin maintained that Golden Meadow did not want to control the parish's boards and commissions, but merely have its representatives on them.
[8] The trial court also observed that this case "boils down to a Council that has ignored tradition and ... common courtesy to a degree," and the ultimate method for correcting the controversy lies with the voters at "the ballot box."
[9] LSA-Const. Art. V, § 5, entitled Supreme Court: Jurisdiction: Rule-Making Power: Assignment of Judges, provides in pertinent part as follows:

(D) Appellate Jurisdiction. In addition to other appeals provided by this constitution, a case shall be appealable to the supreme court if (1) a law or ordinance has been declared unconstitutional or (2) the defendant has been convicted of a capital offense and a penalty of death has actually been imposed.
[10] The forty-eight sections of Article XIV of the Constitution of 1921, entitled "Parochial & Municipal Affairs" were quite bulky, consuming over 240 pages in LSA-Const. Vol. 3.
[11] The full text of LSA-Const. Art. VI, § 5, provides as follows:

§ 5. Home Rule Charter
Section 5. (A) Authority to Adopt; Commission. Subject to and not inconsistent with this constitution, any local governmental subdivision may draft, adopt, or amend a home rule charter in accordance with this Section. The governing authority of a local governmental subdivision may appoint a commission to prepare and propose a charter or an alternate charter, or it may call an election to elect such a commission.
(B) Petition to Elect Commission. The governing authority shall call an election to elect such a commission when presented with a petition signed by not less than ten percent of the electors or ten thousand electors, whichever is fewer, who live within the boundaries of the affected subdivision, as certified by the registrar of voters.
(C) Adoption; Amendment; Repeal. A home rule charter shall be adopted, amended, or repealed when approved by a majority the electors voting thereon at an election held for that purpose.
(D) Adoption by Two or More Local Governmental Subdivisions. Two or more local governmental subdivisions within the boundaries of one parish may adopt a home rule charter under this Section if approved by a majority of the electors in each affected local governmental subdivision voting thereon in an election held for that purpose. The legislature shall provide by law the method of appointment or election of a commission to prepare and propose a charter consistent with Paragraph (A) of this Section and the method by which the electors may petition for an election consistent with Paragraph (B) of this Section. However, at least one member of the commission shall be elected or appointed from each affected local governmental subdivision.
(E) Structure and Organization; Powers; Functions. A home rule charter adopted under the Section shall provide the structure and organization, powers, and functions of the government of the local governmental subdivision, which may include the exercise of any power and performance of any function necessary, requisite, or proper for the management of its affairs, not denied by general law or inconsistent with this constitution.
(F) Additional Powers and Functions. Except as prohibited by its charter, a local governmental subdivision adopting a home rule charter under this Section shall have the additional powers and functions granted to local governmental subdivisions by other provisions of this constitution.
(G) Parish Officials and School Boards Not Affected. No home rule charter or plan of government shall contain any provision affecting a school board or the offices of district attorney, sheriff, assessor, clerk of a district court, or coroner, which is inconsistent with this constitution or law.
[12] The verbatim transcripts of the convention proceedings at which the constitutional provisions were drafted, are considered as valuable aids, and should be given some weight, in determining the purpose, intent and consequent meanings of the provisions. See New Orleans Firefighters Association v. Civil Service Commission of the City of New Orleans, 422 So.2d 402, 407 (La.1982).
[13] After the reading of proposed Section 8 (Art. VI, § 5), Delegate Kean explained the committee's proposal and invited questions. Portions of this discussion are as follows:

Mr. Avant: Mr. Kean, when we were discussing Section 7 [LSA-Const. Art. VI, § 4], you explained and I believe ... and I know correctly so, that these two terms "powers and functions" as opposed to the other two words "structure and organization" which, as contained in the plan of government of the City of Baton Rouge, that under the language of the courts had held that a general state law establishing minimum pay scales and longevity pay for firemen would not be applicable to the city of Baton Rouge because that was a matter of structure and organization. The pay of personnel and working conditions of personnel related to structure and organization rather than powers and functions. You remember making that ... that was the La Fleur case.
Mr. Kean: That's correct.
* * * * * *
Mr. Duval: Mr. Kean, as I understand it, Subsection (E) of Section 8 [Art. VI, § 5(E)], starting with line 28, basically is a La Fleur case, enunciates the rule of the La Fleur case?
Mr. Kean: Starting on in (E) on line 28, page 4?
Mr. Duval: Yes.
Mr. Kean: Yes.
Mr. Duval: Now what effect does ... let's see if we can understand what that means. Does that mean that the legislature can pass no law which in any way contradicts, affects, modifies, or changes the powers and duties set forth in a home rule charter purely adopted by local government, the citizens of local government?
Mr. Kean: No, the legislature would retain the authority to adopt laws which deal with the powers and functions of local government. But, insofar as structure and organization is concerned, which would include the manner in which you set-up the government, the people you employ in it, things of this kind, the legislature could not.
Mr. Duval: Well, if that's all it does, I agree with it. But, it says "the legislature shall not pass ..."
Mr. Henry: You've exceeded his time Mr. Duval.
Further Discussion
Mr. Lanier: Mr. Chairman, fellow delegates, by way of additional explanation of Section 8, Section 8 and Section 9 [Art. VI, §§ 5 and 6] have to be read in conjunction with each other. Quite frankly, they are the heart of the home rule article ...
* * * * * *
Mr. Roy: Mr. Lanier, you heard Mr. Kean's explanation of the case of La Fleur v. City of Baton Rouge, did you not?
Mr. Lanier: There's two cases; there's Letellier v. Jefferson Parish, La Fleur v. City of Baton Rouge. I have them right here.
Mr. Roy: Well, the one that ... I understand, but without going into all other cases LaFleur says that the legislature was not allowed to force the city of Baton Rouge to pay certain salaries and what have you to firemen and policemen because under the Baton Rouge charter, pursuant to the Constitution of 1921, that dealt with structure and organization. Is that right?
Mr. Lanier: This is a very good point and I'm glad you brought it up, because I would like to explain this to the delegates as well as you. There is a very significant distinction between organization and structure and powers and functions. The provisions of 8(E) deal with organization and structure. This language or similar language presently exists in the home rule charter of the parish of Jefferson and in the East Baton Rouge city-parish charter.
[At this juncture in the debate, the "Pugh Amendment," which omits § 8(E) [Art. VI, § 5(E)], is introduced.]
* * * * * *
Mr. Duval: Mr. Pugh, looking over your amendment, I see it leaves out Section (E) of the committee proposal which is the codification of the LaFleur case. What I'm wondering is this. Under your amendment, could the legislature by statute change a structural provision in a home rule charter?
Mr. Pugh. Not an existent charter. This is for the new ones. Let me tell you something. He said there are two cases, but there are three cases. The other case happens to be the Shreveport case.
Mr. Duval: Now, so you believe that ... in your amendment then, if a municipality would incorporate ... would have a home rule charter in the future, then the structure of that home rule charter could be changed by legislative act. Is that right?
Mr. Pugh: No, I didn't say that.
Mr. Duval: Oh, I thought you did.
Mr. Pugh: I said that the legislature can provide by general law what would be in a charter. I never said anything about changing ...
Mr. Duval: I understand that. Now my question relates to how can structure be changed since the language in the committee proposal is left out of your amendment? Do you think under your amendment, structure can be changed as a legislative act?
Mr. Pugh: I think when they create the general law to provide for this, they may provide structure and organization as well as powers and functions in my opinion.
Mr. Duval: But, can it be changed by a legislative act?
Mr. Pugh: No, sir.
* * * * * *
(Records, Sept. 20, 1973, pp. 1341-1343)
Thereafter, Delegate Pugh's amendment was adopted by the convention 60 to 59. Records, Id., p. 1347. Nonplussed, the proponents of the committee's proposal motioned to reconsider the Pugh amendment and eventually prevailed in having the amendment rejected. Id., pp. 1347-1353.
[14] This court's decision in Letellier v. Jefferson Parish, 254 La. 1067, 229 So.2d 101 (1969), applied La Fleur approvingly to an identical charter provision set forth in the Constitution of 1921 for Jefferson Parish, holding a state statute which created a pension plan for Jefferson Parish firemen unconstitutional as a matter forming an integral part of the structure and organization of the parish's local government.
[15] See note 13 regarding the delegates' debate over the Pugh Amendment. The day after the Pugh amendment was defeated, Delegate Buddy Roemer, together with Delegates Kelly, Ginn and others, submitted another amendment. Their amendment included the deletion of Article VI, § 6, from the committee's proposal. During the question and discussion period which followed the reading of his proposed amendment, the following discourse occurred:

Mr. Duval: Buddy, the main Objection I have to your amendment is that you fail to include the language, "the legislature shall not pass any law the effect of which changes, modifies, or affects the structure and organization of any local government subdivision." If an amendment... do you think that your amendment really takes the heart out of the home rule charter by leaving out this language?
Mr. Roemer: I don't think so. I think that's the crux of the issue, Stanley. There's been some court rulings as to what structure and organization is, as you know, and it seems to... the court ruling seems to blur the distinctions between powers and functions, and just because we say "structure and organization" here and leave out "powers and functions," I still think they've left over for interpretation one way or the other.
Mr. Duval: So it is your intent to allow the legislature to pass laws affecting home rule charters insofar as structure and organization is concerned?
Mr. Roemer: Well, I think that the record clearly shows that without the support of the legislators from the district in effect, the local political subdivision, you won't have any such action by the legislature.
Mr. Duval: In other words, can you guarantee that to me sir?
Mr. Roemer: Can I guarantee that to you?
Mr. Duval: Yes, sir.
Mr. Roemer: I can't even guarantee that I'm going to be here tomorrow.
Mr. Duval: Right.
Mr. Roemer: With questions like yours, I can only guarantee you one thing, Mr. Duval.
Mr. Duval: You will tell me ... the answer is though that the legislature can, under your amendment, pass such a law. Is that right?
Mr. Roemer: Can do it.
Mr. Duval: Thank you.
* * * * * *
Mr. Lanier: Mr. Chairman and fellow delegates, this is the moment of truth for home rule in the State of Louisiana. I want you to consider carefully the differences between the amendment which is presently proposed and the committee proposal. The primary difference, there are several differences, but the main, primary, overriding difference is the fact that the provisions of Section E of the committee proposal are left out. Now, the provisions of Section E of the committee proposal, if you will look at it, the pertinent part is lines 28 to the end and finishes up on the next page. But it says, "The legislature shall not pass any law the effect of which changes, modifies, or affects the structure and organization and/or the particular distribution of the powers and functions of any local governmental subdivision which operates under a home rule charter. (sic) This is a constitutional guarantee that if local units of government ... adopt a home rule charter, the legislature cannot meddle with their organization and structure. Now, what is the effect of not having such a proposal in our new constitution? The effect of it is that the legislature is not prohibited from meddling with our organization and structure, and therefore, it has the power to so, because the legislature in the State of Louisiana by our constitution and under the Tenth Amendment of the United States Constitution, has all of the legislative powers.... Now, this is about as gut an issue as you can get, and the policy determination that you have to make as individual delegates, and this is a policy decision, is "do you want to afford that type of protection to home rule units or do you not?" I would submit to you fellow delegates that if you do not afford this protection, there is no reason to go home rule. What would a home rule charter mean if you cannot protect it? What would be the reason to adopt a home rule charter? It would be no different than a legislative charter because it would be subject to review by the legislature. We have legislative charters today. Why do people want to go home rule? They want to go home rule for protection. Now, let me point this out: in the present charters of the parishes of Jefferson and the parish of East Baton Rouge, there is such a provision. This provision has been interpreted judicially here in the State of Louisiana in several cases, and it provides that the legislature may not meddle with your organization and structure under the exact language or similar language as appears herein. The reason for this is to make it desirable to go home rule. If there is no advantage to go home rule, then why should anybody want to do it? Now that's the main issue ... Therefore, fellow delegates, I would suggest to you that this amendment should not be accepted by you. I would further suggest to you that the committee proposal adequately and properly establishes valid home rule for the State of Louisiana. I would request that you reject the amendment and adopt the committee proposal. Thank you, Mr. Chairman.
* * * * * *
Mr. Kean: Mr. Chairman, fellow delegates, I rise in opposition to this amendment. The Pugh amendment was a good amendment in comparison to this one ... What rights and authority does that local government have once it's adopted that home rule charter? If you look at Article XIV, Section 40, of the Louisiana Constitution [of 1921], under which the present legislative home rule charters are authorized, you'll find a grant of authority. So that once you have established your home rule charter, you know what rights, obligations and authority that the new governmental structure has. This is silent, and I'll tell you why it's silent. The committee attempted to place in the authority of its home rule charter provision, a provision that insofar as structure and organization was concerned, the legislature could not affect that charter. That came from the La Fleur case to which Mr. Roy has averted. The La Fleur case was dealing with the city of Baton Rouge which has protection insofar as structure and organization is concerned, or at least had it up until yesterday, and the court there held that the pay of firemen was a matter of structure and organization, and therefore, the legislative act establishing minimum wages for firemen did not apply to the city of Baton Rouge. The committee has endeavored to place that rule, in my opinion of a sound and necessary rule for meaningful home rule, in this provision. That's the crux of this fight. The special interests that I referred to yesterday is the AFL-CIO, led by Mr. Flory. They don't want the municipalities and local governmental units of this state to have the right to deal with their own structure and organization, and to provide for the paying of their own employees, and to deal with the working conditions and other rights of local employees. They want to be able to go to the legislature and have the legislature deal with that problem insofar as the municipalities are concerned, and that's the reason this provision is silent insofar as authority of the home rule charter is concerned. So I say to you, if you adopt this, you might as well delete Section 8 [Art. VI, § 5] because we'd have just about as much under the circumstances ... So I say to you delegates, we might as well face up to the issue that is really before us. Do we want meaningful home rule for local government in this state? If you do, you vote for the committee proposal. If you don't, you vote for this proposal because you don't give it to them.
Further Discussion
Mr. Chatelain: Mr. Chairman and fellow delegates, I rise in opposition to this amendment, and I'd like to tell you some reasons why I oppose this amendment. The issue is simply this: organization, powers and structures of the city governments, or the local governments. This is the issue. There are those people who do not want this in the control of the local people. They want it in the control of the legislature. I say that we are writing a 1974 model constitution, and we should have in the constitution, let's give these municipalities, cities, and parishes throughout this state constitutional rights, instead of having the fear of being tampered with by the legislature. Let me state a few facts. In 1946, in the city of New Orleans there was a young legislator by the name of Chep Morrison. Soon after he became a floor leader, and then along the lines, he decided to run against a very powerful mayor in the City of New Orleans, Mayor Maestri, whom he defeated at the polls, and subsequent to that in 1948, he decided he'd support his friend, Sam Jones, for governor, and you know what happened in that race. Governor Earl Long in the second primary of that race upset the apple cart, and he carried the city of New Orleans and with him on his coattail he carried many legislators that were supported by the old regular faction in the city of New Orleans, and what happened after that? After the governor took over, and after the legislators took their seats in power, they began to do what I'm fearful can happen to many cities in this state. This is what happened, and you can check with the delegates from New Orleans area who know this history. I was alive at that time. They took the power they had, and they changed the charter of the City of New Orleans entirely without one single vote of the people. This is what happened. Check the records, with not one single vote of the people they changed the structure and power of the City of New Orleans. I don't want to see this happen in the years to come. We are writing a constitution that will be viable, a constitution that will serve all of the people, and don't leave it to the whims of the legislature as we go along. I urge you to defeat this amendment, and stick to the committee proposal. Thank you.
* * * * * *
Mr. Duval: Mr. Chairman, fellow delegates, hopefully not to be redundant, merely to set forth the issue to you, I would like to state the following: I think this is the issue. The Roemer amendment leaves out a very essential clause, that is, "the legislature shall not pass any law which will affect the structure and organization of the home rule unit." He said very candidly when I questioned hime (sic) that that means the legislature can then pass such a law affecting the structure and organization of the unit. This is the issue. Do you think the legislature should be able to do this or shouldn't? This is not trying to pull any wool over your eyes; it is stating the issue directly. I would like to also quote from people who have studied this for many years, from people who are recognized experts. I think we have all become self-appointed experts in fields without really giving it much thought. Now, Dean Herbert [Hebert], Dean of the L.S.U. Law School who is a pretty eminent legal scholar, I think, says and if you read your "Focus on CC '73," you will see that when home rule is discussed and local government, the concept basically, as styled by the committee, is endorsed by the experts in the field, not self-appointed, self-ordained experts, but experts who have spent a lifetime studying the matter, which I think you should give some consideration. Here's what Dean Herbert [Hebert] says after discussing the La Fleur case and after commenting favorably about the rule of the La Fleur case. Clearly then, the adoption of home rule charters should go a long way towards eliminating the practice of interest groups gaining special dispensations from state legislature, leaving the bill to be paid by local government. You make up your minds. Thank you.
(Records, September 21, 1993, pp. 1358-1359)
* * * * * *
Mr. Jenkins: Mr. Chairman, delegates, I'm distressed at the criticism of this amendment because, I think it's one of the first real good amendments we have had.... Then it's been said that this amendment changes the amendatory process in existing home rule charters. Well, that's not true. In the previous section we provided that the amendment process in existing home rule charters would be as provided in those charters. This isn't going to change that. I think we are talking about one thing. We are talking about a giant power grab by local government. We are talking from a legal standpoint, something much more serious and more permanent. We are talking about the creation of a third level of sovereignty in this country, a third level. We already have two, the federal government, and we have the state government. But local governs (sic) are mere creatures are mere creatures of the state government, they are not sovereign now. Once a grant of sovereignty is made, it cannot be taken away. If we once yield sovereignty to the local governments, we'll never be able to take that away. We are going to literally have thousands of little kingdoms or republics or dictatorships depending on how they take a course in these local areas....
Mr. Stagg: Mr. Chairman and fellow delegates,... Under a constitution of any state, municipalities are dealt with in one of two differing ways. A municipality (1) can as the government closest to the people do anything not specifically denied to that community by the state's constitution or (2) they can as Mr. Jenkins put it, they are creatures of the legislature and they can have under the constitution just so much power as the legislature gives them to do. They are two opposing points of view ... We are talking about in this section of this constitution, what shall a city be prepared to do for its people, not to them. What powers can a city have as against, for instance, the legislature? ... But what we are talking about now is what kind of home rule do you wish the cities of this state to have? It's a simple question. Do you want the city ... there is the government closest to the people to be able to do what the people want them to do, charges them with doing and permit them to do, so long as it isn't denied by the constitution? If that's how you want it, then vote for the committee proposal. If you want your cities simply to be the creature of the legislature bound down by the legislature, then you shall vote for the Roemer amendment; it's just that simple. What kind of cities do you want? If you want to run your business in your town as your people will permit it to be run, then you stick mostly with the committee proposal. If you want the legislature constantly calling the shots, then you vote for the Roemer amendment...
Thereafter, the Roemer amendment was rejected by a vote of 57-60. (Id., pp. 1363-64).
See also the debates on the amendments offered by Delegate Jenkins, Sept. 21, 1973, pp. 1366-1373, by Delegate Dennis, Sept. 21, 1973, pp. 1373-1375, by Delegate Kelly, Sept. 22, 1973, pp. 1387-1394, by Delegate Conroy, Sept. 25, 1973, pp. 1397-1408, the amendments and debates that occurred after the third reading and final passage of § 8 [Art. VI, § 5], Sept. 21, 1973, pp. 1356-1357, and the comments by Delegate Kean in support of § 9 [Art. VI, § 6], Sept. 25, 1973, p. 1414.
[16] In Francis v. Morial, this court affirmed the unconstitutionality of a statute which changed the distribution of powers and functions, at the local level, of the home rule charter of New Orleans. The charter had been constitutionalized by Art. VI, § 4, and it established the New Orleans Aviation Board and provided for its functions. The statute pertained to the selection and appointment of members to the aviation board. This court determined the statute had correctly been held unconstitutional by the trial court because it changed the § 4 home rule charter's distribution of powers and functions in violation of Art. VI, § 6, and did not constitute a reasonable exercise of the state's police power under Art. VI, § 9(B) so as to qualify as an exception to the prohibition against state interference with home rule discretion. 455 So.2d at 1173. The operation of the statute did not "tend in some degree to prevent an offense or evil or otherwise to preserve public health, morals, safety or welfare," and it did not disclose any purpose or appear to have any real or substantial relation to an appropriate object of the police power. 455 So.2d at 1174. Instead, this court found the statute "merely redistributes the power and function of selecting a minority of the aviation board from the New Orleans officials to those of three other local governments." Id. Therefore, this court concluded that, even if the statute had accomplished a valid police power object, the small benefit conferred would not be commensurate with the interference and burdens the statute placed on the home rule charter government. Id.
[17] The police power, while not susceptible to precise definition, is generally the inherent power of the state to govern within constitutional limits persons and things for the promotion of general security, health, morals and welfare. Francis v. Morial, 455 So.2d at 1172. See also Records, statements of Delegate Avant at 1445 and Delegate Casey at 1453-1454. To sustain legislation under the police power, the courts must find its operation tends in some degree to prevent an offense or evil or otherwise to preserve public health, morals, safety or welfare, and if a statute discloses no such purpose, has no real or substantial relation to these objects, or is a palpable invasion of rights secured by fundamental law, it is the duty of the courts to give effect to the constitution. Francis v. Morial, 455 So.2d at 1172-3.
[18] See Records, Sept. 27, 1973, pp. 1445-1465, where the Avant amendment which had passed by a vote of 61 to 48 on September 26, 1973, the 54th day of the convention proceedings, was replaced the following day by a vote of 63 to 55 with the Casey amendment. Article VI, § 9(B) is the Casey amendment. The Dennis amendment, which would have added to § 9 a paragraph (C) providing that "[t]his article shall not limit the power of the legislature to enact laws of statewide concern," was rejected by a vote of 52 to 68. Cf. City of New Orleans v. Board of Commissioners of the Orleans Levee District, at pp. 22-24, 640 So.2d at 250-251.
[19] Since Act 314 of 1991 does not constitute a valid exercise of the police power under Francis v. Morial, supra, it unequivocally fails to constitute a valid exercise of the police power under the more stringent analysis of the power set forth in City of New Orleans v. Board of Commissioners of the Orleans Levee District, supra.
[20] As applied to Art. VI, § 4 home rule charter local governments, to determine the constitutionality of the statute under Art. VI, § 6, the specific language of their charters must be examined.